Frank C. WHITTINGTON, II, Plaintiff Below, Appellant,

v.

DRAGON GROUP, L.L.C., Thomas D. Whittington, Jr., Richard Whittington, L. Faith Whittington, and Dorothy W. Minotti, Marna A. McDermott, Sarah I. Whittington, Ruth A. Whittington, Matthew D. Minotti, Dorothy A. Minotti, Defendants Below, Appellees.

No. 392, 2009.

Supreme Court of Delaware.

Submitted: Nov. 3, 2009.
Decided: Dec. 18, 2009.

Richard H. Cross, Jr., Esquire (argued) and Amy Evans, Esquire, Cross & Simon, Wilmington, Delaware, for appellant.

John G. Harris, Esquire, Berger Harris, LLC, Wilmington, Delaware, for appellees, Dragon Group, L.L.C., Thomas D. Whittington, Jr., Richard Whittington, L. Faith Whittington and Dorothy W. Minotti.

Richard I.G. Jones, Jr., Esquire (argued) and Andrew D. Cordo, Esquire, Ashby & Geddes, Wilmington, Delaware, for appellees, Marna A. McDermott, Sarah I. Whittington, Ruth A. Whittington, Matthew D. Minotti and Dorothy A. Minotti.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice, for the majority.

The plaintiff-appellant, Frank C. Whittington, II ("Frank"), brought this action to enforce his rights as an alleged member of Dragon Group, L.L.C. ("Dragon Group"), a Delaware limited liability company. The defendants-appellees include Frank's four siblings, all of whom are members of Dragon Group: Thomas D. Whittington, Jr. ("Tom"), Richard Whittington ("Richard"), L. Faith Whittington ("Faith") and Dorothy W. Minotti ("Dorothy") (collectively, the "Sibling Defendants"). The remaining defendants are Dragon Group and certain other members of the Whittington family, who are not of the same generation as Frank. The defendants Tom and Richard are also managers of Dragon Group.

The Court of Chancery held that Frank's action was barred by the doctrine of laches. In reaching that decision, it determined that the analogous statute of limitations is three years. We have concluded the applicable analogous statute of limitations is twenty years. Therefore, this matter will be remanded to the Court of Chancery for further consideration in accordance with our holding in this opinion.

### *Facts* [1]

In 2001, Frank and the Sibling Defendants entered into an Agreement in Princi-

---

1. These facts are taken from the Court of Chancery's opinion dated June 11, 2009.

ple (the "AIP"), which constituted a global settlement of the case styled *Whittington v. The Farm Corp.*, and various other disputes. In the *Farm Corp.* case, Frank sought recognition of his proportionate ownership interest in various business entities owned and operated by the Sibling Defendants, including Whittington Ltd. ("Ltd."). On June 14, 2001, each of the parties to that litigation signed the AIP following three days of trial before the Court of Chancery.

The AIP is a single-page document containing eleven numbered paragraphs. It provides in relevant part:

3. Frank gets 10 shares of Ltd. Stock upon payment of $10,000 (without interest). Frank's proportionate interest in Ltd. will be carried forward into Dragon Group LLC with same rights as all other members.

* * *

5. In full repayment of a $190,000 loan from Dorothy B. Whittington, Frank pays Estate $90,000 and waives his interest in his Generation Skipping Trust in favor of his four siblings; Estate releases to Trust and Trust releases to Frank 55 Ltd. shares upon payment.

* * *

10. Frank, and other members, will receive periodic financial and operating information for Ltd., Frog Hollow and Dragon Group as outlined in items 22 and 23 of the March 21, 2001, letter of Todd C. Schiltz.

11. All payments set forth herein above shall be made by June 30, 2001, and appropriate documentation acceptable to all parties to accomplish same including without limitation the Certificate of Formation and Operating Agreement for Dragon Group, L.L.C.

Claiming Frank failed to perform under the AIP, the Sibling Defendants filed a motion with the Court of Chancery to enforce that agreement. The Court of Chancery heard the motion on October 11, 2001, and held that the AIP should be enforced as a contract. Among other things, the Court of Chancery expressly held that the parties' inability to agree upon the form of certain documents contemplated in the AIP (*e.g.*, releases, a new note, and new governing documents for certain related entities) did not make the AIP unenforceable.

Despite the Court of Chancery's ruling, the parties continued their pattern of delay, waiting nearly a year before purporting to comply fully with the express terms of the AIP. Unable to work together cooperatively or effectively, the parties never completed certain of the secondary documentation referred to in the Court of Chancery's ruling. The parties could not agree, for example, on a proposed form of operating agreement for Dragon Group prepared by the Sibling Defendants to reflect Frank's membership in that entity.

On September 23, 2002, Tom distributed that document (the "Offering Memorandum") to all prospective members of Dragon Group. The Offering Memorandum provided that each member must pledge his shares of Ltd. stock as a prerequisite for membership in Dragon Group. The Offering Memorandum also stated that "[a]ny shareholder [of Ltd.] not returning all documents fully executed on or before the close of business on October 15, 2002, will be deemed not to have accepted the offer and thus not be able to participate."

Frank submitted an executed copy of the Offering Memorandum by the deadline on October 15. In that copy, however, he changed his Dragon Group ownership in-

terest from 17.77% to 24%. On October 15, 2002, at 4:10 p.m., Frank also paid the aggregate $100,000 referenced in paragraphs 3 and 5 of the AIP and the Sibling Defendants delivered to him the stock certificates for the 65 total shares of Ltd stock.

By letter dated November 1, 2002, Tom, Dragon Group's sole managing member at the time, informed Frank's counsel that Frank's altered version of the Offering Memorandum constituted a counteroffer that had been rejected. In response, on December 9, 2002, Frank, acting *pro se,* filed a Motion for Order Compelling Defendants' Compliance with Court Order and Directing Performance by Substitute (the "2002 Motion"). That motion essentially asked the Court of Chancery to resolve the differences among the parties as to the form of the ancillary documentation for Dragon Group, and to permit relitigation of certain issues resolved by the AIP.

In a letter opinion dated March 4, 2003, the Court of Chancery denied Frank's 2002 Motion. With respect to Dragon Group's operating agreement, which also is at issue in this action, the Court of Chancery ruled that the "terms of the [Dragon Group] LLC operating agreement will be those that were established at its inception, adjusted to reflect Frank Whittington's percentage ownership therein." Seizing upon the fact that the Court of Chancery had denied Frank's 2002 Motion, the Defendants apparently claimed victory and proceeded as if nothing had changed. Frank, on the other hand, believed his position had been vindicated and mistakenly assumed he would be included as a member of Dragon Group with a 23.65% ownership stake. In fact, however, after the March 4, 2003, letter opinion, the Defendants never took any action to include Frank as a member of Dragon Group.

Frank's sister, Dorothy, testified at trial but did not reveal during the discovery period, that she had spoken to Frank by telephone only days after the March 4, 2003, ruling. According to Dorothy, she informed Frank that she and the other Sibling Defendants believed they had prevailed in the 2002 Motion and, consequently, Frank was not a member of Dragon Group. Frank denied that this conversation occurred.

In April 2003, Frank initiated discussions concerning his rights under the AIP with two attorneys, Jay Katz and Jeffrey Boyer, before engaging them formally as his legal counsel on May 23, 2003. Katz and Boyer had detailed discussions with Frank about the AIP. According to Katz, "[Frank] was adamant that [the Sibling Defendants] were not treating him as a member [of Dragon Group]. He was being excluded. He was not getting information on Dragon Group and he was very upset about that." At the time, the Dragon Group matter was only one of several disputes Frank had with his siblings.

After their engagement, Katz and Boyer sent a global settlement offer on behalf of Frank to Jeffrey Weiner, counsel for the Sibling Defendants. The offer proposed "a buy-out by the [Sibling Defendants] of all of Frank's interests (including notes) in all of the entities for fair market value." The Sibling Defendants rejected Frank's settlement offer on July 7, 2003. About a day or two later, Katz called Weiner to inquire about the rejection and the Sibling Defendants' refusal to negotiate. At trial, Katz described that conversation as follows:

I pointed out to the fact that Frank had complained that he wasn't getting the Dragon Group financial statements.

And [Weiner] said, "Why should he get them? He's not a member.

So I asked [Weiner] why [Frank]'s not a member. And isn't that what the [AIP] says. And he gave me his explanation of why he didn't think Frank was a member."

[Weiner] said two different things. One was that in the creation of Dragon Group or at some point all of the Whittington family members who were supposed to be members of Dragon Group were supposed to do something. In that case I think it was, as I remember, to turn over certain certificates. Frank had refused. This was part of the deal. And when Frank ... had refused, they took that as his saying "Well, I don't want to really be a member." And there might have been some other things he did about marking up some documents. I can't specifically remember what that was, but some back-and-fourth which, in his mind, was Frank's rejection of membership in Dragon Group and, therefore, he wasn't entitled to the financial statements.

Shortly after this conversation and before July 20, 2003, Katz informed Frank of the Sibling Defendants' position that he was not a member of Dragon Group, and, therefore, had no right to receive any financial information from that company.

In August 2003, the entities owned by the Sibling Defendants collectively convened an annual stockholders' meeting. Frank attended with Boyer, but they were excluded from the meeting when the discussion turned to Dragon Group. According to Katz, Boyer "was told that since Frank didn't have an interest in Dragon Group, that he wasn't invited to the meeting or he couldn't stay for the meeting."

The next communication regarding Frank's status vis-à-vis Dragon Group occurred when Tom sent a letter to Frank, dated April 14, 2004, stating that Frank had been sent a K–1 for Dragon Group in error. The letter stated:

The Dragon Group LLC K–1 was sent to you in error. . . . You are not a member of Dragon Group LLC. I looked at your file on this matter and there is correspondence to your attorney regarding the fact that you did not return an appropriately signed Agreement nor did you send Maura your [Ltd.] shares to be used as security for loans that Dragon Group might need.

Frank admits that this letter provided notice of the Sibling Defendants' position that he was not a member of Dragon Group.

In late 2004, Dragon Group called upon its members to make a capital contribution. In connection with that call, Dragon Group received $36,152 on January 12, 2005. The funds contributed by the Sibling Defendants were taken from a dividend approved by the Ltd. board. Dragon Group did not call upon Frank to make a capital contribution, presumably because the Defendants did not consider him a member of that entity.

In December 2003, Dragon Group entered into a $4 million mortgage with Ltd. for a property in New Castle County, Delaware. Dragon Group made timely payments on the mortgage at a nine percent interest rate from December 2003 until September 2006, when it satisfied the mortgage. Frank admits that he generally was aware of the mortgage payments from Dragon Group to Ltd.

### Procedural History

Frank commenced this litigation by filing a Verified Complaint for Declaratory and Injunctive Relief (the "Complaint") against Dragon Group, Tom, Richard, Faith and Dorothy on July 20, 2006. On October 25, 2006, Frank moved for summary judgment. The Court of Chancery

heard argument on that motion and denied it in an oral ruling on May 8, 2007. Frank then filed a Verified Amended Complaint (the "Amended Complaint") on June 22, 2007, which added the other individual Defendants. Later in 2007, Frank dismissed Defendant Marna C. Whittington without prejudice. On February 19, 2008, the remaining Defendants filed a joint motion for summary judgment on their defense of laches. The Court of Chancery issued an opinion denying that motion on June 6, 2008. A four-day trial was held from June 10 to 13, 2008, and the Court of Chancery heard post-trial argument on January 30, 2009.

Frank asked for three different but related types of relief in the Court of Chancery. First, he asked the Court of Chancery to enforce the Dragon Group operating agreement and find that his membership interest under that agreement is 23.65%. Second, commensurate with that membership interest, Frank asked for an order compelling the Defendants to turn over his proportionate share of all profits from Dragon Group, including any distributions. Third, Frank requested an accounting of Dragon Group to determine the extent of his share of its profits.

In the Court of Chancery, the Defendants contended that Frank was precluded from obtaining such relief because he failed to bring his claims within the applicable statute of limitations. The Defendants also argued that, notwithstanding the statute of limitations, the doctrine of laches bars Frank's claims. In addition, the Defendants disputed the merits of Frank's claims. They asserted that Frank is not a member of Dragon Group because he failed to comply with specific admission requirements. Alternatively, the Defendants submitted that, even if Frank is a member of Dragon Group, his membership interest is far less than 23.65%. In reply, Frank asserted that these defenses are barred by the doctrines of res judicata, collateral estoppel, and judicial estoppel based on the outcomes of two prior rulings by the Court of Chancery dated October 21, 2001, and March 4, 2003. Frank also asserted that the doctrine of unclean hands prohibits the Defendants from raising any defense to his claims.

The Court of Chancery concluded that this action should be dismissed on the ground of laches. Therefore, it did not address the merits of Frank's claims. It noted, however, that Frank has stated a plausible claim that he was to be a member of Dragon Group under the AIP with an ownership interest possibly as high as 23.65% and that the Defendants breached the AIP. For purposes of its opinion, the Court of Chancery assumed, without deciding, that but for the laches defense, Frank would prevail on those aspects of his claims. Nevertheless, and despite having made that assumption, the Court of Chancery decided it was unnecessary to reach Frank's counter-arguments based on res judicata, collateral estoppel, and judicial estoppel.

### *Doctrine of Laches*

Both the doctrine of laches and statutes of limitations function as time bars to lawsuits. Unlike a statute of limitations, the equitable doctrine of laches does not prescribe a specific time period as unreasonable.[2] Laches is an unreasonable delay by a party, without any specific reference to duration, in the enforcement of a right, and resulting in prejudice to the adverse party.[3] An unreasonable delay

---

**2.** *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).

**3.** *Id.*

can range from as long as several years[4] to as little as one month.[5] The temporal aspect of the delay is less critical than the reasons for it. In some circumstances even a long delay might be excused.[6]

■ Although statutes of limitations always operate as a time-bar to actions at law, they are not controlling in equity.[7] As this Court recently held in *Reid v. Spazio:*

> A court of equity moves upon considerations of conscience, good faith, and reasonable diligence. Thus, although a statute of limitations defense is premised solely on the passage of time, the lapse of time between the challenged conduct and the filing of a suit to prevent or correct the wrong is not, in itself, determinative of laches. Instead, the laches inquiry is principally whether it is inequitable to permit a claim to be enforced, the touchstone of which is inexcusable delay leading to an adverse change in the condition or relations of the property or the parties. Under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law; but, if unusual conditions or extraordinary circumstances make it ineq-

uitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute, the [court] will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it.[8]

Accordingly, the "doctrine of laches also permits [the Court of Chancery] to hold a plaintiff to a shorter period if, in terms of equity, the plaintiff should have acted with greater alacrity, and when the plaintiff's failure to seek equitable relief with alacrity threatens prejudice to the other party."[9]

■ Laches bars an action in equity if: "[t]he plaintiff waited an unreasonable length of time before bringing the suit and . . . the delay unfairly prejudices the defendant."[10] Therefore, laches generally requires proof of three elements: "'first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant.'"[11] This doctrine "is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights."[12] As explained by this Court in *Federal United Corp. v. Havender:*[13]

> A court of equity moves upon considerations of conscience, good faith and rea-

4. *See Cooch v. Grier,* 59 A.2d 282, 287–88 (Del.Ch.1948).

5. *See Stengel v. Rotman,* 2001 WL 221512, at *7 (Del.Ch. Feb.26, 2001).

6. *Cooch v. Grier,* 59 A.2d at 286–87.

7. *Reid v. Spazio,* 970 A.2d at 183.

8. *Id.* (citations and internal quotation marks omitted).

9. *Territory of U.S. V.I. v. Goldman, Sachs & Co.,* 937 A.2d 760, 808 (Del.Ch.2007) (citing *CertainTeed Corp. v. Celotex Corp.,* 2005 WL 217032, at *6 (Del.Ch. Jan. 24, 2005)); *see also U.S. Cellular Inv. Co. of Allentown v. Bell*

*Atl. Mobile Sys., Inc.,* 677 A.2d 497, 503 n. 7 (Del.1996) ("[W]hatever is notice calling for inquiry is notice of everything to which such inquiry might have led.") (quotation omitted).

10. *Hudak v. Procek,* 806 A.2d 140, 153 (Del. 2002).

11. *Reid v. Spazio,* 970 A.2d at 182–83 (quoting *Homestore, Inc. v. Tafeen,* 888 A.2d 204, 210 (Del.2005)).

12. *Adams v. Jankouskas,* 452 A.2d 148, 157 (Del.1982); *Reid v. Spazio,* 970 A.2d at 182.

13. *Fed. United Corp. v. Havender,* 11 A.2d 331 (Del.1940).

sonable diligence. Knowledge and unreasonable delay are essential elements of the defense of laches. The precise time that may elapse between the act complained of as wrongful and the bringing of suit to prevent or correct the wrong does not, in itself, determine the question of laches. What constitutes unreasonable delay is a question of fact dependent largely upon the particular circumstances.[14]

"A statute of limitations period at law does not automatically bar an action in equity because actions in equity are time-barred only by the equitable doctrine of laches."[15] Where the plaintiff seeks equitable relief, however, the Court of Chancery applies the statute of limitations by analogy.[16] Absent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches.[17]

### Analogous Statute of Limitations

The general rule for determining which statute of limitations should apply by analogy to a suit in equity is that " 'the applicable statute of limitations should be applied as a bar in those cases which fall within that field of equity jurisdiction which is concurrent with analogous suits at law.' "[18] Delaware courts use the following test for determining whether a legal claim is analogous to the equitable claim at issue:

> [W]here the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases, or in reference to the same subject matter, and where the legal and equitable claim so far correspond, that the only difference is, that the one remedy may be enforced in a court of law, and the other in a court of equity.[19]

The Court of Chancery concluded that "Frank's claims ultimately are predicated upon the AIP and that this action is 'based upon a promise' within the meaning of section 8106:"

> Frank's claims unquestionably relate to the same subject matter as would a legal claim for damages based on an alleged breach of the AIP.[20] As a practical matter, there is not likely to be much difference between the prosecution of Frank's claim here for an accounting and a claim for damages in a court of law. Thus, Frank's claims for declaratory relief and an accounting are analogous to a legal claim for the same relief. In the case of his request for injunctive relief, it is simply a remedy that may be enforced in a court of equity, as opposed to a claim for damages, which may be pursued at law.

Therefore, the Court of Chancery held that the three-year statute of limitations in title 10, section 8106 of the Delaware Code

---

14. *Id.* at 343.

15. *Albert v. Alex. Brown Mgmt. Servs.*, 2005 WL 1594085, at *12 (June 29, 2005); *see also Adams v. Jankouskas*, 452 A.2d at 157.

16. *See Weiss v. Swanson*, 948 A.2d 433, 451 (Del.Ch.2008).

17. *Adams v. Jankouskas*, 452 A.2d at 157.

18. *Ohrstrom v. Harris Trust Co.*, 1998 WL 44983, at *2 (Jan. 28, 1998) (quoting *Artesian*

*Water Co. v. Lynch*, 283 A.2d 690, 692 (Del. Ch.1971)).

19. *Artesian Water Co. v. Lynch*, 283 A.2d at 692 (quoting *Perkins v. Cartmell's Adm'r*, 4 Del. 270, 274 (4 Harr.) (Del.1845)) (punctuation omitted).

20. Delaware allows claims for declaratory relief to be brought both in equity and at law. *See* Del.Code Ann. tit. 10, § 6501 (1999).

was the analogous statute of limitations for purposes of its laches analysis.

### Exception For Contract Under Seal

The Court of Chancery noted, however, that "one exception to the three-year statute of limitations for contract actions specified in title 10, section 8106 is for contracts under seal, for which the common law twenty-year period applies."[21] In the Court of Chancery, Frank argued that the AIP is a contract under seal. In support of his argument, Frank noted that the word "seal" appears in typed letters beside the signature line for each signatory of the AIP.

The Court of Chancery ruled that while "documents of debt, such as mortgages or promissory notes, escape the three-year limitation if they contain the most minimal reference to a seal, actions arising from other types of contracts must show a clearer intent to enter into a contract under seal." In support of that ruling, it relied upon the case of *American Telephone & Telegraph Co. v. Harris Corp.*,[22] where the Superior Court held:

> In Delaware, for an instrument other than a mortgage to be under seal . . . "it must contain language in the body of the contract, a recital affixing the seal, and extrinsic evidence showing the parties'

intent to conclude a sealed contract. . . . The mere existence of the corporate seal and the use of the word "seal" in a contract do not make the document a specialty."[23]

Because the AIP is neither a mortgage nor a promissory note, the Court of Chancery concluded that a number of the cases Frank relied upon were inapposite.

The record reflects that the AIP contains no reference to a seal other than the printed word "seal" next to each signature. The Court of Chancery held "that evidence is insufficient to demonstrate an intent of the parties to enter into a sealed contract." Accordingly, it reiterated its holding that "the three-year statute of limitation for contracts applies by analogy in this case."

### Contract Under Seal

■ In this appeal, as a matter of first impression for this Court, we must decide what evidence is necessary to establish a specialty contract under Delaware law. The term "specialty contract" refers to a contract under seal and is used to distinguish a sealed contract from an ordinary, unsealed contract.[24] Under Delaware law, a contract under seal is subject to a twenty-year statute of limitations.[25] However, exactly what constitutes a sealed

**21.** *See State v. Regency Group, Inc.*, 598 A.2d 1123, 1129 (Del.Super.1991) (citing *Leiter v. Carpenter*, 22 A.2d 393 (Del.Ch.1941); *Garber v. Whittaker*, 2 A.2d 85 (Del.Ch.1938)).

**22.** *Am. Tel. & Tel. Co. v. Harris Corp.*, 1993 WL 401864 (Del.Super. Sept. 9, 1993).

**23.** *Id.* at *7 (quoting *Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1129 (3d Cir.1990)).

**24.** *See Morgan v. Sharon Pa. Bd. of Educ.*, 472 F.Supp. 1157, 1159 (W.D.Pa.1979) ("Pennsylvania law . . . has no statute of limitations for specialty contracts under seal such as plaintiff's teaching contract."); *Paige v. Jurgensen*,

204 Ga.App. 524, 419 S.E.2d 722, 724 (1992) ("The agreement for the sale of the stock was a contract under seal, or specialty contract as defined by [Georgia statute] . . . ."); *Alexander v. Capitol Lumber Co.*, 181 Ind. 527, 105 N.E. 45, 48 (1914) (discussing the case where "the common-law sanctity of specialty contracts, or those under seal, [was] abolished"); *see also Halvorson v. Blue Mountain Prune Growers Co-op.*, 188 Or. 661, 214 P.2d 986, 990 (1950) ("The fact is, however, that the unsealed contract herein was in no sense a specialty. It was, rather, an informal, simple, or parole contract in writing.").

**25.** *Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127, 1127–28 (3d Cir.1990).

instrument (that is not a mortgage or deed) under Delaware law is not clear because there is a conflict in the trial courts' decisions, in particular, between *In re Beyea's Estate*[26] and *American Telephone & Telegraph Co. v. Harris.*[27]

### Conflicting Delaware Cases

In *Beyea's Estate*, Judge Speakman of the Orphan's Court held that a promissory note with the word "Seal" printed to the right of in line with the signature on the note was an instrument under seal.[28] The note did not contain a testimonium clause and there was no reference to the parties' intention to render the note a sealed instrument in the body.[29] In holding the note a sealed instrument, Judge Speakman reiterated Delaware's common law doctrine of sealed instruments:

> [I]t has been a matter of general and common knowledge in this State for many years past that usage and custom has sanctioned the use of printed forms of notes *and other contracts with the word "Seal" printed on the form immediately to the right of the place intended for the signature,* and that when such a printed form is used for the purpose for which it was intended, and is signed to the left of and in line with the printed word "Seal", upon the delivery of the executed obligation for or on behalf of the maker to the person for whom it was intended, or to his authorized agent, the character of the obligation of the maker is that of an obligation or contract under seal, *irrespective of whether there is any indication in the body of the obligation itself that it was intended to be a sealed instrument.*[30]

Accordingly, in *Beyea's Estate*, the court held that bank-held promissory notes were under seal, based solely on the placement of the word "seal" to the right of the signatures.[31]

In *American Telephone & Telegraph Co. v. Harris Corp.,*[32] the Superior Court held that "for an instrument other than a mortgage to be under seal, '... it must contain language in the body of the contract, a recital affixing the seal, and extrinsic evidence showing the parties' intent to conclude a sealed contract....' "[33] The only evidence of the parties' intent to create a contract under seal in *Harris*—the presence of corporate seals and the word "seal" on the signature page of the license agreement at issue—was insufficient as a matter of law to show that the agreement was a specialty contract.[34]

### Other Delaware Cases

In a case that predated *Harris, Peninsula Methodist Homes and Hospitals, Inc.*

---

26. *In re Beyea's Estate,* 15 A.2d 177, 180 (Orphan's Ct.1940).

27. *Am. Tel. & Tel. Co. v. Harris Corp.,* 1993 WL 401864 (Del.Super.Sept.9, 1993).

28. *In re Beyea's Estate,* 15 A.2d 177, 180 (Orphan's Ct.1940).

29. *Id.* at 178.

30. *Id.* at 180 (emphasis added); *see also* 1 Sugden on Powers 300 ("If the seal, stick, or other instrument used be impressed by the party on the plain parchment or paper with an intent to seal, it is clearly sufficient.").

31. *Id.* at 178. "Neither note contained any testimonium or attestation clause, nor was there any mention of the word 'Seal' or 'Sealed,' or other word of similar import, in the body of either note." *Id.*

32. *Am. Tel. & Tel. Co. v. Harris Corp.,* 1993 WL 401864, at *7 (Del.Super. Sept. 9, 1993).

33. *Id.* (quoting *Aronow Roofing Co. v. Gilbane Bldg. Co.,* 902 F.2d 1127, 1129 (3d Cir.1990)).

34. *Id.* (granting summary judgment).

*v. Architect's Studio, Inc.,*[35] the Superior Court found a contract to waterproof a balcony to be under seal in reliance on *Beyea's Estate's* rule that "the word 'seal' printed to the right of the parties' signatures is effective as a seal." [36] Although the contract there had the word "seal" below rather than beside each signature, the court's conclusion was buttressed by the presence of a testimonium clause "immediately above the signatures," further evidencing the parties' intent to create a contract under seal.[37]

Conversely, *Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.*[38] exemplifies where applying the *Harris* rule rather than the *Peninsula/Beyea's Estate* rule controls the outcome. The court there examined a franchise contract and a lease, each bearing only a corporate seal after the parties' signatures and a testimonium clause identical to the one in *Peninsula.*[39] The contracts were held not under seal because the "the mere presence of a seal and a testimonium clause are not enough to create a sealed instrument;" the court "allow[ed] discovery to develop extrinsic evidence of the parties' intent with respect to sealing the agreements." [40]

More recently, *Consolidated Rail Corp. v. Liberty Mutual Insurance Co.*[41] applied the *Harris* rule in the context of a construction contract and found that although "[t]he signature clauses do make reference to the words 'seal' and/or 'sealed,' ... the significance of those references are unclear." [42] In the absence of any extrinsic evidence of intent or evidence of intent within the body of the contract, the Superior Court held the contract could not be considered a specialty. The court acknowledged *Peninsula* and distinguished it on policy—rather than factual—grounds, stating that to the extent that *Peninsula* "represents a contrary holding in circumstances similar to those present herein, this court respectfully declines to follow it." [43] The court reasoned that "no purpose would be served by according the same archaic presumptions applicable to mortgages as sealed instruments to documents other than mortgages absent clear evidence of the parties [sic] intent to do so." [44]

### Other States

Most states have enacted *statutes* that address the issue of what constitutes an

---

35. *Peninsula Methodist Homes & Hosps., Inc. v. Architect's Studio, Inc.,* 1985 WL 634831 (Del.Super. Aug. 28, 1985).

36. *Id.* at *1–2.

37. *Id.* The testimonium reads: "In witness whereof, the parties hereto have hereunto set their hands and seals, the day and year first above written." *Id.* at *2.

38. *Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.,* 1995 WL 411319 (Del.Super. June 30, 1995).

39. *Id.* at *5.

40. *Id.* at *6.

41. *Consol. Rail Corp. v. Liberty Mut. Ins.,* 2002 WL 32080503 (Del.Super. Sept. 6, 2002).

42. *Id.* at *5.

43. *Id.* at *7. Similar to the contract in *Peninsula,* the contract in *Consolidated Rail* bore only the phrase "Signed, Sealed and Delivered" to the left of one party's signature and the phrase "Seal Attest" beside the other party's signature. The *Consolidated Rail* court did note, however, that there was no evidence of intent to create a specialty contract in the body of the contract, arguably distinguishing it from *Peninsula's* testimonium. But the failure of the court to draw out this distinction also suggests that it understood *Peninsula* to stand for the proposition that a "seal" is sufficient. *Id.* at *6.

44. *Id.* at *7.

instrument under "seal." The treatise *Williston on Contracts* contains a chart with each state's position and statutory provisions regarding sealed instruments.[45] Some states find sufficient evidence of an intent to create a contract under seal in the affixation of a "seal" to the right of the signatures, together with a testimonium or other clause in the body of the contract indicating an intent to create a sealed document.[46] Delaware has not modified the common law by statute.

Several courts follow the common law rule that was summarized in *Beyea's Estate* and find sufficient evidence to create a specialty contract merely from affixing the word "seal" next to the parties' signatures. For example, in an action to recover on a promissory note, the Supreme Court of South Dakota rejected the argument that "because there is no language in the body of the note indicating that it was intended to be a sealed instrument, it is not...."[47] Rather, the court held that:

> [a]t least until the contrary is shown the seal itself evidences an intention to make a sealed instrument. A recital of the intention in the body of the instrument would undoubtedly be additional evidence of the intention, but it adds nothing in our opinion to the legal effect of the seal.[48]

Similarly, the District of Columbia Court of Appeals has held that the word "seal" next to an individual's signature is sufficient to create a sealed document: "[I]n the case of an individual, in contrast to a corporation ... the presence of the word "seal" next to an individual's signature is, standing alone, sufficient to create a sealed instrument."[49]

### Beyea's Holding Adopted

█ In *Whittington*, the Court of Chancery relied on *Harris*, rather than *Beyea's Estate*. In assessing the strength of *Harris* as describing the rule regarding "sealed" instruments in Delaware, several points must be considered. First, New York law governed the "sealed" document at issue in *Harris*. Second, the discussion in *Harris* regarding the evidence needed to establish a "sealed" instrument in New York concluded that the result in Delaware would be the same and distinguished *Beyea's Estate* in a footnote. That footnote in *Harris*, however, inadvertently referred to the document in *Beyea's Estate* as a mortgage when in fact it was a promissory note. Third, in reaching its conclusion, the *Harris* opinion relied on the Third Circuit's decision in *Aronow Roofing Co. v. Gilbane Building Co.*[50] for its interpreta-

45. 1 Williston on Contracts § 2:17 (4th ed.) (2009).

46. *See, e.g., Crane v. Pringle*, 378 So.2d 721, 723 (Ala.1979); *Beach v. Beach*, 141 Conn. 583, 107 A.2d 629, 634 (1954); *Rouse–Teachers Props., Inc. v. Md. Cas. Co.*, 358 Md. 575, 750 A.2d 1281, 1287 (2000); *Fid. Union Trust Co. v. Fitzpatrick*, 134 N.J.L. 250, 46 A.2d 837, 839 (E. & A.1946); *In re Pirie*, 198 N.Y. 209, 91 N.E. 587, 589 (1910); *Square D Co. v. C.J. Kern Contractors, Inc.*, 314 N.C. 423, 334 S.E.2d 63, 66 (1985).

47. *Commercial Serv. Corp. v. Stratton*, 69 S.D. 70, 6 N.W.2d 441, 441 (S.D.1942).

48. *Id.* Cf. *Peninsula Methodist Homes & Hosps., Inc. v. Architect's Studio, Inc.*, 1985 WL 634831, at *1–2 (Del.Super. Aug. 28, 1985) (describing the testimonium as "additional" evidence of an intent to create a sealed contract).

49. *Burgess v. Square 3324 Hampshire Gardens Apartments, Inc.*, 691 A.2d 1153, 1156–57 (D.C.1997) (lease); *see also McNulty v. Med. Serv. of D. C., Inc.*, 176 A.2d 783, 783 (D.C. 1962) (finding a sealed contract for services based solely on the seal of the individual).

50. *Aronow Roofing Co. v. Gilbane Bldg. Co.*, 902 F.2d 1127 (3d Cir.1990).

tion of Delaware's law on sealed instruments. The *Aronow* opinion, in turn, interpreted a construction contract under Delaware law, but cited to a District of Maryland case and *Corbin on Contracts* for the proposition that more than the word "seal" is required to demonstrate an intent to create a non-mortgage specialty contract.[51]

In the absence of legislative guidance, we are persuaded by the decision in *Beyea's Estate* and adopt that common law holding as the law of Delaware. The opinion in *Beyea's Estate* provides a bright line standard that is easily applied. Accordingly, we hold that in Delaware, in the case of an individual, in contrast to a corporation, the presence of the word "seal" next to an individual's signature is all that is necessary to create a sealed instrument, "irrespective of whether there is any indication in the body of the obligation itself that it was intended to be a sealed instrument." [52]

### Conclusion

This matter is remanded to the Court of Chancery for reconsideration of its laches holding by applying a twenty-year statute of limitations for purposes of analogy. Within sixty days, the Court of Chancery should report to this Court with its findings of facts and conclusions of law. Jurisdiction is retained.[53]

JACOBS, Justice, dissenting.

The majority opinion commendably and quite accurately highlights the confusion in our case law on the question of what constitutes an instrument under seal (sometimes referred to as a "specialty contract"). That question would ordinarily be of interest mostly to antiquarians, but for the unique (and, in my view, unfortunate) consequence of being deemed a "specialty contract." For ordinary (*i.e.*, non-specialty) contracts, the applicable statute of limitations is three years.[54] But, for a contract under seal, there is no statute of limitations; instead, a twenty-year limitations period has traditionally been imposed as a matter of common law.[55] That is why the issue of what precisely must be shown for an instrument to be considered "under seal" matters significantly.

In this case, the only evidence that the contracting parties intended to create a sealed instrument is that the word "seal" appears next to the signature line. The question is whether that, without more, (such as, for example, a testimonium or similar express recital that the parties intend for the contract to be under seal) is sufficient evidence of intent to create a specialty instrument. The Court of Chancery held it is not. The majority holds that it is. In my opinion, the majority's rule represents an inadvisable policy choice that would frustrate the reasonable expectations of parties to many commercial contracts. I must therefore dissent.

Sealed instruments are an artifact of a period of history that has, by and large, long passed into obscurity. During that earlier period, a seal was a symbol well-

---

**51.** *See id.* at 1129 (citing *President and Dirs. of Georgetown Coll. v. Madden*, 505 F.Supp. 557, 585 (D.Md.1980)).

**52.** *In re Beyea's Estate*, 15 A.2d 177, 180 (Orphan's Ct.1940). *Accord Burgess v. Square 3324 Hampshire Gardens Apartments, Inc.*, 691 A.2d 1153, 1156–57 (D.C.1997) (lease); *see also McNulty v. Med. Serv. of D.C., Inc.*, 176 A.2d 783, 783 (D.C.1962) (finding a

sealed contract for services based solely on the seal of the individual).

**53.** Supr. Ct. R. 19(c).

**54.** 10 *Del. C.* § 8106.

**55.** See cases cited at n. 21, *supra.*

understood in commerce as intended to confer solemnity upon a contract involving contractual transactions historically thought to be of significance and tending to be of long duration. The original, paradigmatic "specialty" instruments—deeds and mortgages—were of this character. Given their nature, there was a rough congruence between the duration of those instruments and the twenty-year limitations period governing their enforcement.

Had the category of "specialty instruments" been restricted to deeds, mortgages, and similar instruments memorializing transactions in land, the issue of what evidence suffices to constitute a "sealed instrument" would likely be of little moment. What gave life to the issue were efforts to broaden this category to include conventional commercial instruments involving non-land related transactions with far shorter time horizons, such as (for example) promissory notes,[56] construction contracts,[57] and franchise contracts[58] wherein the word "seal" was printed next to the parties' signature line. In today's modern commercial environment, it becomes more difficult in such cases to presume that the placement of the (often preprinted) word "seal" next to the contracting parties' signature line conclusively evidences that the parties intend to subject themselves to contract-based litigation for twenty years, rather than the normal three year period. Understandably, for that reason there developed conflicting Superior Court authority requiring additional evidence that parties to conventional commercial agreements actually intended that result, before imposing upon them the dramatic consequence of according their contract "specialty" status.[59]

As the majority correctly notes, the legislatures of several states have resolved this problem, either by abolishing the seal entirely, or by prescribing what kind of evidence will suffice for a contract to be an instrument under seal. Unfortunately, in Delaware the General Assembly has not provided guidance in this area.

The majority acknowledges the conflict in our case law, but has resolved that conflict in favor of a rule that "the word 'seal' next to a signature is all that is necessary to create a 'sealed' instrument, 'irrespective of whether there is any indication in the body of the obligation itself that it was intended to be a sealed instrument.'" The majority favors this rule because it "provides a bright line standard that is easily applied." Concededly, their rule does that. My difficulty, however, is that ease of application is not the only

56. *In re Beyea's Estate*, 15 A.2d 177 (Del. Orphan's Ct.1940).

57. *Peninsula Methodist Homes and Hosps. Inc. v. Architect's Studio, Inc.*, 1985 WL 634831 (Del.Super.Ct. Aug. 28, 1985) (involving a contract to waterproof a balcony); *Consol. Rail Corp. v. Liberty Mutual Ins. Co.*, 2002 WL 32080503 (Del.Super.Ct. Sept. 6, 2002).

58. *Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.* 1995 WL 411319 (Del.Super.Ct. June 30, 1995).

59. *Am. Tel. & Telegraph Co. v. Harris Corp.*, 1993 WL 401864 (Del.Super.Ct. Sept.9, 1993) (holding that the presence of corporate seals and the word "seal" on the signature page of license agreement were legally insufficient to render the agreement a specialty contract); *Peninsula Methodist Homes and Hosps., Inc. v. Architect's Studio, Inc.*, 1985 WL 634831, at *1–2 (holding that the testimonium reciting that "In witness whereof, the parties have hereunto set their hands and seals, the day and year first above written" was sufficient additional evidence that the parties intended to create a contract under seal); *contra Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.*, 1995 WL 411319 (holding that the mere presence of a seal and a testimonium clause not sufficient to create a sealed instrument); *Consol. Rail Corp. v. Liberty Mutual Ins. Co.*, 2002 WL 32080503 (same).

policy at stake here. Also at stake is the policy that underlies all statutes of limitations: creating a period of repose from litigation after a prescribed period of time. That policy, in my view, deserves greater weight where the dispute involves contracts other than the historic, paradigmatic instruments (deeds and mortgages) to which the common law twenty-year limitations period originally was applied.

To state it more plainly, in today's modern commercial environment, it is unreasonable and (I submit) an inadvisable policy to subject parties to commercial contracts to the risk of litigation for twenty years without requiring at least mini-mally persuasive evidence that the parties intended that result. In my view, the common law rule should be that the use of the boilerplate term "seal," without more, should be insufficient to visit twenty years of exposure to litigation upon contracting parties. I therefore would affirm the judgment of the Court of Chancery, and respectfully dissent.