# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSEPH M. CAPANO and<br>AAMM TRUST, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 8721-VCN |
| | ) | |
| v. | ) | |
| | ) | |
| LOUIS J. CAPANO, JR., LOUIS J.<br>CAPANO, JR. INVESTMENTS, L.P. II,<br>CAPANO INVESTMENTS, LLC,<br>LOUIS J. CAPANO, III,<br>MIDWAYCAP, LLC and CI TRUST, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | | |

| | | |
|---|---|---|
| GERARD J. CAPANO, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 8767-VCN |
| | ) | |
| v. | ) | |
| | ) | |
| LOUIS J. CAPANO, JR., CAPANO<br>INVESTMENTS, LLC, CI TRUST and<br>MIDWAYCAP, LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION

Date Submitted: January 14, 2014
Date Decided: June 30, 2014

Jeffrey L. Eichen, Esquire of Drinker Biddle & Reath LLP, Wilmington, Delaware, and Alan S. Fellheimer, Esquire of Fellheimer & Eichen LLP, Philadelphia, Pennsylvania, Attorneys for Plaintiffs.

Michael A. Weidinger, Esquire, Elizabeth Wilburn Joyce, Esquire, and Seton C. Mangine, Esquire of Pinckney, Weidinger, Urban & Joyce LLC, Wilmington, Delaware, Attorneys for Defendants.

NOBLE, Vice Chancellor

Two brothers, Louis and Joseph, owned (or effectively controlled) identical minority interests in a family limited liability company which held three real estate assets.[1] Their mother transferred a portion of an interest in the company to a business trust for the benefit of a third brother, Gerry. Gerry had voting control over the trust, which granted him a tie-breaking vote and prevented either brother from obtaining unilateral control over the company. In 2000 and 2001, Louis and Gerry executed several documents purporting to grant Louis a voting proxy and an option to purchase Gerry's interest, and then to transfer Gerry's interest in the trust to Louis.

After the mother's recent death, Louis exercised the rights purportedly transferred to him by Gerry to complete a merger between the family company and an entity he controls and thereby cash Joseph out of the company. In separate complaints, collectively asserting twenty-seven counts, both Joseph[2] and Gerry challenge the underlying transfers of Gerry's interests (voting and economic) in the company from the trust to Louis and in other ways attempt to disrupt the merger. Louis seeks the dismissal of all claims other than Joseph's challenge to the fairness of the merger.

---

[1] First names are used for convenience and in an effort to avoid confusion.
[2] There are two plaintiffs in Joseph's suit, Joseph and a family trust closely affiliated with Joseph (sometimes collectively referred to as "Joseph").

1

The Court heard both motions to dismiss at the same time, and it determined that if any of Gerry's claims survived, the cases would be consolidated. Although many of Gerry's and Joseph's claims survive, certain claims for fraud are not averred with particularity and are dismissed. A few claims are barred by laches, Joseph lacks standing to challenge the conveyances made by Gerry to Louis, and Joseph has no claim to inspect books and records. Furthermore, Joseph abandoned several claims by ignoring them throughout briefing and oral argument, and they are therefore dismissed.

## I. BACKGROUND

A. *The Parties and the Events Leading to Louis's and Joseph's Divided Interest in the Family Company*

Brothers Louis J. Capano, Jr. ("Louis"), Joseph M. Capano ("Joseph"), and Gerard J. Capano ("Gerry") are sons of Louis J. Capano, Sr. ("Louis Sr."). Louis Sr., Louis, and Joseph were equal partners in a Delaware partnership, "Capano Investments," which acquired, improved, operated, and leased property in New Castle County, Delaware.[3] The partnership acquired the Midway Shopping Center near Wilmington, Delaware on May 3, 1979. On February 28, 1980, Louis Sr. passed away and his partnership interest became part of his estate. Louis Sr.'s

---

[3] Gerry's Verified Compl. ("Gerry Compl.") ¶ 10; Joseph's Verified Compl. ("Joseph Compl.") ¶ 13. Because there are two complaints, they, along with the motions directed to them, will be identified by the named plaintiff in each matter (Gerry or Joseph). Joseph's action was filed under Civil Action No. 8721-VCN and Gerry's action was filed under Civil Action No. 8767-VCN.

wife, Marguerite A. Capano ("Marguerite"), was the executrix of his estate and formed a trust, which held Louis Sr.'s partnership interest.

Joseph alleges that he and Louis had a strained relationship as far back as 1992 and thus they hired an intermediary to assist in a fair and equal allocation of certain Capano family assets between them.[4] Joseph claims they reached agreement on a plan to divide the assets, which included those assets owned by Capano Investments.[5] Joseph contends he only learned in 2013 that Louis did not intend to comply with this agreement.[6]

Marguerite, as trustee of the trust holding Louis Sr.'s interest, through sale and assignment agreements, divided Louis Sr.'s interest among Louis Capano III ("Louis III"), Louis's son; AAMM Trust, a trust which has Anthony Capano ("Anthony"), Joseph's son, as its trustee;[7] and a business trust ("CI Trust")[8] created with Gerry as its beneficiary and with Daniel P. McCollom ("McCollom") serving as its trustee.[9] CI Trust received a three percent interest in Capano

---

[4] Joseph Compl. ¶ 158.
[5] *Id.* ¶ 159.
[6] *Id.* ¶¶ 160-61.
[7] The term "Plaintiffs" shall include Joseph, Gerry, and AAMM Trust.
[8] Gerry Compl., Ex. 7; Joseph Compl., Ex. 9. Marguerite made clear her intent to form a business trust in the trust agreement which stated, "[i]t is the intent of the parties hereto that the Trust constitute a business trust under Chapter 38 of Title 12 of the Delaware Code." Gerry Compl., Ex. 7 §1.05; Joseph Compl., Ex. 9 § 1.05.
[9] Gerry Compl. ¶ 14 & Ex. 2, Ex. 3; Joseph Compl. ¶¶ 22-24 & Ex. 4, Ex. 5. Gerry and Joseph, when recounting the facts, attack the underlying sale agreement and assignments and claim that one or the other is null and void because Marguerite could not have transferred the same partnership interests twice. However, Plaintiffs do not appear to seek to unwind these transactions through their complaints. Additionally, Joseph repeatedly appears to accept the

3

Investments. Louis III and AAMM Trust each received half of Louis Sr.'s remaining interest of 30.3% of Capano Investments. After these transactions, Louis and Joseph each owned 33.33% of Capano Investments, Louis III and AAMM each owned 15.17%, and CI Trust owned 3%. In effect, Louis and Louis III thus controlled 48.5% of the partnership and Joseph and his son Anthony also controlled 48.5%. Gerry alleges CI Trust's 3% interest was to function as a "swing vote" if Louis and Joseph were deadlocked in some matter concerning Capano Investments.[10]

On June 16, 2000, Capano Investments' partners converted the partnership to a Delaware limited liability company, Capano Investments, LLC ("CI-LLC" or the "Company").[11] The members and their respective ownership interests in CI-LLC were the same as those in Capano Investments.

B. *The Documents Purporting to Grant Louis Control of CI Trust and Other Events Preceding the Merger*

In 2000 and 2001, Gerry and Louis executed three different documents granting Louis an interest in CI Trust. Gerry and Louis executed two documents in 2000 granting Louis certain rights in CI Trust, although they are undated and the

---

validity of Anthony's interest in AAMM Trust in his complaint and Gerry asserts that he is the proper beneficial owner of CI Trust. The ownership by AAMM Trust and Gerry of Louis Sr.'s interest arises from these transactions.

[10] Gerry Compl. ¶ 30.

[11] Gerry Compl., Ex. 4; Joseph Compl., Ex. 6.

specific dates of execution have not been alleged.[12]  First, Gerry and Louis executed a document titled "Grant," through which Gerry granted Louis an irrevocable proxy to direct CI Trust's trustee to vote its interest in CI-LLC (the "Power to Direct").[13]  Second, they executed a document titled "Agreement," through which Gerry granted Louis an option to purchase Gerry's interest in CI Trust if Gerry dies, if Louis is unable to exercise the Power to Direct as he wishes, or upon 60 days written notice to Gerry (the "Option").[14]

In the Option, Louis acknowledged that no transfer could occur without the consent of CI Trust's trustee.  The Option states that the purchase price for the interest in CI Trust was $100,000 plus forgiveness of a $100,000 advance made to Gerry by Louis to be paid upon closing, which would occur within 30 days of the date the Option was exercised.  An additional hand-written provision providing for Louis to pay certain taxes was also added to the Option below its printed terms.[15]  Both the Power to Direct and the Option have "(SEAL)" printed next to the signature lines on which Gerry and Louis signed.[16]  The Power to Direct is also witnessed.

---

[12] The documents have the year 2000 printed on them and blanks the parties could fill in to specify the execution date, though they did not do so.  *See* Gerry Compl., Ex. 6, at 4-7; Joseph Compl., Ex. 8, at 4-7.

[13] Gerry Compl., Ex. 6, at 4; Joseph Compl., Ex. 8, at 4.

[14] Gerry Compl., Ex. 6, at 5-6; Joseph Compl., Ex. 8, at 5-6.

[15] Gerry Compl., Ex. 6, at 6; Joseph Compl., Ex. 8, at 6.

[16] Gerry Compl., Ex. 6, at 4, 7; Joseph Compl., Ex. 8, at 4, 7.

Gerry challenges the validity of both the Power to Direct and the Option for several reasons. One of these challenges relates to settlement payments owed to the family of Anne Marie Fahey ("Fahey"), based upon a wrongful death suit her family filed against all of the Capano brothers and certain of their companies.[17] Fahey's family alleged that the Capanos conspired to thwart the investigation into Fahey's disappearance and death.[18]

The suit was scheduled to go to trial in January 2001, but settled for an undisclosed amount. Gerry claims that Louis told him that Gerry's personal liability in the Fahey suit would require Gerry to come up with a few hundred thousand dollars, his share of the settlement.[19] Gerry could not pay his share and already owed Louis $100,000. Louis thus allegedly offered to forgive Gerry the $100,000 he owed and to pay him an additional $100,000 in exchange for an assignment of all right, title, and interest in and to CI Trust. Gerry apparently rejected the offer, but Louis made a counteroffer to supply the same consideration in exchange for only Gerry's leasing rights held through CI Trust.[20] Louis apparently told Gerry that he wanted control over the Company's leases because he

---

[17] Louis, Joseph, and Gerry had a fourth brother, Thomas, who was convicted of the murder of Fahey in 1997. At Fahey's trial, Gerry and Louis both testified that they had assisted Thomas after the murder. Gerry and Louis were charged with, and pled guilty to, minor crimes and were sentenced to probation. Gerry Compl. ¶¶ 104-05.

[18] *Id.* ¶ 106. Joseph was not charged with any crime involving her death and was later dismissed from the civil suit.

[19] *Id.* ¶ 109.

[20] *Id.* ¶¶ 110-11.

was concerned that Joseph would lease Company property to undesirable tenants, which would devalue the property and harm the Company.[21]

Gerry asserts that in 2000, while the Fahey suit was still ongoing and had not yet settled, Louis preyed on Gerry's fears that he could not pay the settlement costs.[22] Gerry does not recall signing the document,[23] especially not in the presence of a witness. He also says he relied on Louis's misrepresentation that he was only transferring leasing rights.

Gerry and Joseph further claim that the Option was never exercised.[24] Even if it was, they assert that the Option and the Power to Direct are null and void because Gerry was not CI Trust's trustee in 2000 and its trustee was not a party to the agreements.[25] Louis also never used the Power to Direct to direct the trustee to vote the interest.[26] Additionally, Gerry alleges that Louis never paid a lump sum of

---

[21] *Id.* ¶ 112.

[22] Gerry also states he felt close with Louis at that time because they both testified for the prosecution against Thomas. In addition, he claims that Louis told him that Joseph would not help him cover any possible costs because Joseph wanted him to learn a lesson and take responsibility for his acts. *Id.* ¶¶ 113-14.

[23] Gerry refers to the Power to Direct and the Option as a single agreement in certain parts of his complaint, although he also at other points uses two separate defined terms to discuss each agreement separately. Here, Gerry seems to be referring to both the Power to Direct and the Option. *See id.* ¶¶ 115, 117.

[24] Gerry Compl. ¶ 121; Joseph Compl. ¶ 99. Gerry and Joseph sometimes refer to this event as a "closing" under the agreement. These allegations should not be understood as assertions that the Option itself was signed, but was not closed. No separate signing and closing is contemplated by the Option. The only "closing" under the Option concerns Louis's exercise of the Option and the transfer of Gerry's interest to him under the agreement. *See* Gerry Compl., Ex. 6, at 5-6, ¶ 2; Joseph Compl., Ex. 8 at 5-6, ¶ 2.

[25] Gerry Compl. ¶ 120; Joseph Compl. ¶ 97.

[26] Gerry Compl. ¶ 123; Joseph Compl. ¶ 95.

7

$100,000 for the Power to Direct and the Option and that Louis never used the Power to Direct in connection with leasing any Company property.[27]

Joseph also wrote to Gerry at least twice during this time period; his letters demonstrate that strains existed among the three brothers.[28] Joseph's first letter, dated September 15, 2000, hinted that Gerry seemed likely to go along with Louis on an unspecified "maneuver."[29] Joseph wrote, "I have asked for nothing more than what was to happen five years ago" and also referenced past complaints Gerry had about Louis's lifestyle and behavior.

Joseph's second letter to Gerry, dated June 11, 2001, appears to have enclosed his first letter from September 2000, and stated "it was obvious Louis was buying you then and you took offense to my statement."[30] Joseph continued, "[i]t's a shame that a couple hundred thousand dollars could sway you." He then proposed a "solution" to split two shopping centers and four office buildings equally between Joseph and Louis and asked Gerry to "split everything equally."

Several documents purporting to transfer Gerry's interest in CI Trust to Louis bear dates from December 2001. First, a document signed by Gerry and McCollom, dated December 1, 2001, evidences McCollom's resignation as

---

[27] Gerry Compl. ¶¶ 122-23.
[28] The exact chronology of these events is unclear. Because the documents from 2000 are undated, the Court is unsure whether Joseph's letters predated or followed the execution of the documents.
[29] Gerry Compl., Ex. 5, at 1; Joseph Compl., Ex. 7, at 1.
[30] Gerry Compl., Ex. 5, at 2; Joseph Compl., Ex. 7, at 2.

CI Trust's trustee and appointment of Gerry to replace him.[31] The next document is an almost identical agreement, but was signed by Gerry and Louis, through which Gerry resigned as CI Trust's trustee and Louis was appointed.[32] The third document, signed only by Gerry, as trustee and beneficiary, purports to assign all of his right, title, and interest in CI Trust to Louis (the "Assignment of Interest").[33] These last two documents are both dated December 25, 2001.

Plaintiffs allege a torrent of problems with these assignment documents in their complaints. First, they claim that Gerry signed the documents while inebriated at a Christmas party and that Louis took advantage of Gerry's intoxicated state to convince him to sign "some papers."[34] Second, Gerry asserts "the documents appear not to have been dated at the time they were purportedly executed,"[35] and both Gerry and Joseph claim the dates were later hand-written by Louis.[36] Third, Gerry alleges Louis never paid any consideration for the assignment.[37] Finally, Gerry and Joseph claim that the assignment was also invalid

---

[31] Gerry Compl., Ex. 6, at 1; Joseph Compl., Ex. 8, at 1.
[32] Gerry Compl., Ex. 6, at 2; Joseph Compl., Ex. 8, at 2.
[33] Gerry Compl., Ex. 6, at 3; Joseph Compl., Ex. 8, at 3.
[34] Gerry Compl. ¶ 34; Joseph Compl. ¶ 47. They further allege that Gerry has no recollection of signing the documents.
[35] Gerry Compl. ¶ 35.
[36] Gerry Compl. ¶ 35; Joseph Compl. ¶ 47 n.13.
[37] Gerry Compl. ¶ 36.

because it violated Delaware's law concerning spendthrift trusts and public policy, Marguerite's intent as a settler, and the terms of the trust itself.[38]

Written consents executed in support of the merger indicate that Louis attempted to assign his interest to a Delaware limited partnership named Louis J. Capano, Jr. Investments L.P. II ("Louis L.P.").[39] These consents purport to ratify the admission of Louis L.P. as a member of CI-LLC. Joseph asserts that no documents exist through which the Company's members consented to admit Louis L.P. as a member.[40]

> CI-LLC's operating agreement also contains a transfer restriction provision:
>
> Except as provided below, no Member shall sell, assign, transfer, hypothecate, pledge, grant any security interest in, encumber or otherwise dispose of (hereinafter referred to collectively as "Transfer") all or any portion of his LLC Interest unless the Members by Majority Vote have consented thereto in writing. In the event of any Transfer of any LLC Interests in any manner, the transferee shall be deemed and shall be admitted as substitute Member only upon (i) the consent of Members by Majority Vote [and] (ii) the transferee's written agreement to be bound by this Agreement . . . . No transfer in violation of this Article VI shall be valid or effective . . . .[41]

Joseph states that Louis must prove he complied with this provision when accepting CI Trust's interest and when he transferred his interest to Louis L.P.[42]

---

[38] *See* Gerry Compl. ¶¶ 46-89; Joseph Compl. ¶¶ 60-93.
[39] Joseph Compl., Ex. 1, Pt. 2.
[40] Joseph Compl. ¶ 107.
[41] Gerry Compl., Ex. 1 § 6.1; Joseph Compl., Ex. 2 § 6.1.
[42] Joseph Compl. ¶ 104. Joseph alleges other violations of CI-LLC's operating agreement based upon these transfers of interest as well.

C. *The Merger*

On February 4, 2013, Marguerite passed away, which precipitated an escalating series of events leading to the merger of CI-LLC into an entity Louis owned. On February 11, 2013, Joseph emailed a Company representative to ask for information on its properties, which included the Midway Shopping Center.[43] The representative agreed to keep Joseph informed on future deals, but explained that Louis's attorney prohibited the representative from providing information about CI-LLC.

On February 15, 2013, Louis wrote to Joseph to inform him that he owned 51.5% of CI-LLC and that he wished to cash Joseph out and separate their offices.[44] In his response, Joseph focused solely on Louis's statement that he owned 51.5% of CI-LLC and he asked Louis to prove his ownership, claiming Joseph had no documentation supporting Louis's claim. Louis, in response, appears to have attached the Assignment of Interest and Joseph's two letters of September 15, 2000 and June 11, 2001.[45] Soon thereafter, the two emailed

---

[43] Joseph Compl., Ex. 12.
[44] Joseph Compl., Ex. 10.
[45] Louis claims the two letters prove that Joseph had knowledge that Gerry transferred CI Trust's interest to Louis. However, Louis admitted in this letter that the Assignment of Interest, which actually granted him the ability to act as CI Trust's trustee and exercise majority control of CI-LLC, was dated December 25, 2001, after the two letters Joseph sent to Gerry. Thus, Joseph may have had knowledge of the Power to Direct and the Option, but his letters could not serve as proof that he knew the Assignment had been executed, since that occurred after the letters were written. Additionally, the topic of the letters is not spelled out and thus could permit an inference other than that sponsored by Louis.

11

concerning an unrelated transaction and appeared to disagree about whether to pursue that transaction as a sale or a lease.[46]

Joseph asserts that Louis's frustrations then boiled over and on May 13, 2013, Louis began executing a series of documents to effectuate a merger (the "Merger") of CI-LLC with MidwayCap, LLC ("Newco"), a Delaware limited liability company owned by Louis. Joseph states that he was provided no advance notice of the Merger and received the documents purporting to consummate it only after it was completed. He received an Agreement and Plan of Merger, dated May 20, 2013, and the written consent ratifying the 2005 admission of Louis L.P. as a member of CI-LLC.[47] On May 21, a second written consent was executed by Louis L.P., Louis III, and CI Trust, with Louis as its trustee, which approved the Merger.[48]

Joseph contests the Merger in a number of ways. In addition to challenging his lack of notice, he alleges Louis denied Joseph and AAMM Trust an opportunity to negotiate, unfairly terminated distributions from the Company to them, looted the Company, and deliberately omitted material facts and documents concerning the Merger. Furthermore, Joseph asserts that the fairness opinion supporting the Merger is fundamentally flawed, the consideration is inadequate, and the

---

[46] Joseph Compl., Ex. 11.
[47] Joseph Compl., Ex. 1, Pt. 2 at 1-3. This was executed by Louis, Louis III, and CI Trust (with Louis acting as trustee).
[48] Joseph Compl., Ex. 1, Pt. 2 at 4-7.

transaction is unfair. He also asserts demand futility and assorted breaches of fiduciary duty.

## D. *Gerry's Additional Allegations*

Additionally, Gerry alleges he has never received any distributions from CI-LLC. He says he believed Louis's misrepresentations that his distributions were being placed into, and managed by Louis in, an account to benefit Gerry's children. Gerry alleges no distributions were made.[49] Gerry also claims Louis lied to him about paying for the private school tuition of Gerry's children. Apparently, unbeknownst to Gerry, Gerry was paying his children's tuition amounts with his own money.[50] After making this perplexing allegation, Gerry requests that he be allowed to inspect the Company's books and records.[51]

## II. CONTENTIONS

Joseph and AAMM Trust filed suit against Louis, Louis L.P., CI-LLC, Louis III, Newco, and CI Trust on July 12, 2013. On August 1, 2013, Gerry filed a separate action against Louis, CI-LLC, CI Trust, and Newco.[52] Between the two complaints, Gerry and Joseph assert claims for declaratory judgment setting forth the parties' respective rights, breaches of fiduciary duty and lack of entire fairness,

---

[49] Gerry Compl. ¶ 134.

[50] *Id.* ¶ 136.

[51] *Id.* ¶ 137. In Count X, requesting access to various books and records, Gerry seeks access to CI-LLC, Newco, all Capano entities in which he has, or had, an interest, and all Capano entities for which he is, or was, an intended beneficiary. *Id.* ¶ 222.

[52] Although there are two other defendants in Joseph's action, the term "Defendants" is used with respect to both complaints for convenience.

aiding and abetting breaches of duty, fraud, breaches of contract, breaches of the implied duty of good faith and fair dealing, waste, inspection of books and records, appointment of receiver, imposition of a trust, and injunctive relief preventing Defendants from engaging in a refinancing. Joseph also asserts claims for conversion and for specific performance to enforce the CI-LLC operating agreement and to divide the assets of the Capano companies between them.

Defendants seek to dismiss the allegations surrounding the agreement from the 1990s and the 2000 and 2001 transactions as barred by laches. They also argue that Joseph lacks standing to challenge the transactions between Gerry and Louis and that Gerry lacks standing to challenge the Merger because he no longer has any interest in CI Trust. Defendants next argue that Plaintiffs' claims about the invalidity of Gerry transferring his interest in CI Trust and Joseph's challenge to the Merger fail to state a claim. They then argue that Plaintiffs' allegations of fraud are not pled with particularity, challenge several specific causes of action, and assert that Joseph abandoned certain claims by ignoring Defendants' challenges to them.

### III. ANALYSIS

Defendants moved under Court of Chancery Rule 12(b)(6) to dismiss nearly all claims of Gerry and Joseph. The reasonable conceivability standard, which asks whether there is a possibility of recovery, is applied and the motion will be

14

denied if Plaintiffs' well-pled factual allegations would entitle them to relief under a reasonably conceivable set of circumstances.[53] The Court will accept all well-pled facts as true and draw all reasonable inferences in favor of Gerry and Joseph.[54] The Court accepts even vague allegations as well-pled if Defendants were provided notice of the claim.[55] Nonetheless, the Court need not accept conclusory allegations that are unsupported by specific facts or draw unreasonable inferences in favor of Plaintiffs.[56]

The Court first considers Defendants' motion to dismiss Gerry's complaint and then evaluates their arguments seeking dismissal of Joseph's complaint.[57]

A. *Are Gerry's Claims Barred by Laches?*

Laches may preclude an action in equity if the "plaintiff waited an unreasonable length of time before bringing suit and . . . the delay unfairly prejudices the defendant."[58] To determine whether a claim is barred, courts evaluate whether the moving party can prove three elements: "first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting

---

[53] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.2d 531, 537 & n.13 (Del. 2011).
[54] *Id.* at 536.
[55] *Id.* That recovery may be reasonably conceivable based on Plaintiffs' well-pled allegations, however, does not necessarily mean that recovery is the most plausible outcome of this litigation.
[56] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enterprise Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).
[57] One claim, asserted by both Gerry and Joseph, is considered at the end of the opinion.
[58] *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002) (citation omitted).

prejudice to the defendant."[59]  Inquiries into whether an unreasonable delay occurred or whether the defendant was prejudiced are inherently factual in nature and depend on a totality of the circumstances.[60]  Thus, motions to dismiss based upon laches are not routinely granted, although a court may grant such a motion if the pleadings demonstrate with reasonable certainty that laches applies and there are "no facts reasonably supporting a contrary inference."[61]

A statute of limitations period will not automatically bar a claim at equity, because the equitable doctrine of laches provides the time-bar defense to equitable claims.[62]  When considering a laches claim, however, a court may consider the statute of limitations period by analogy, and, absent some tolling of the limitations period, give great weight to the statutory time period in deciding whether laches applies.[63]  The Plaintiffs bear the burden of pleading facts demonstrating that tolling applies.[64]

Defendants argue that Gerry's claims are premised on the unenforceability of the Power to Direct, the Option, and the Assignment of Interest executed in 2000 and 2001 and that any claims surrounding these agreements are barred by

---

[59] *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009) (citation omitted).
[60] *See Hudak*, 806 A.2d at 153 (citation omitted).
[61] *Khanna v. McMinn*, 2006 WL 1388744, at *30 (Del. Ch. May 9, 2006).
[62] *See Whittington*, 991 A.2d at 9.
[63] *See id.*
[64] *See Smith v. Mattia*, 2010 WL 412030, at *3 (Del. Ch. Feb. 1, 2010).

laches.[65] This is so, Defendants insist, because the applicable statute of limitations period has passed and because Gerry has failed to demonstrate that tolling applies.[66] As a threshold matter, the parties disagree on the appropriate analogous statute of limitations to apply to the Power to Direct and the Option. Defendants contend that a three-year statute of limitations period applies, while Gerry argues that the 20-year limitations period should be considered for contracts signed under seal. Gerry also asserts that a basis to toll the limitations period exists.

The Court concludes that Gerry either has pled facts supporting tolling or is protected by the analogous statute of limitations for the majority of his claims. Thus, most of his claims concerning the Power to Direct, the Option, and the Assignment of Interest survive the laches challenge. However, his fraud claims relating to the Power to Direct and the Option are barred.

1. Which Statute of Limitations Applies to the Power to Direct, the Option, and the Assignment of Interest?

Defendants argue that 10 *Del. C.* § 8106 serves as the analogous statute of limitations for claims such as claims for breach of fiduciary duty, fraud, and breach

---

[65] Defendants make these arguments in response to Gerry's complaint although they incorporate those arguments into their response to Joseph's complaint as well. *See* Defs.' Br. in Supp. of Their Mot. to Dismiss [Joseph's] Verified Compl. ("Joseph DOB") at 19-20.

[66] Defendants also offer a traditional laches analysis, but, given the deference to the analogous statute of limitations, the Court concludes that the analysis which follows resolves the Defendants' motion on this issue.

of contract.[67]  "[A] cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of that cause of action."[68]  Because a claim accrues at the time of a wrongful act, even if the plaintiff is ignorant of it, there is no real dispute that Gerry's causes of action arising from the Power to Direct and the Option accrued sometime in 2000 and those arising from the Assignment of Interest accrued sometime in 2001.

However, Gerry claims that, because the Power to Direct and the Option were signed under seal, a 20-year limitations period controls.[69]  The requirements for a contract under seal are minimal; "in Delaware, in the case of an individual, . . . the presence of the word "seal" next to an individual's signature is all that is necessary to create a sealed instrument . . . ."[70]

The presence of the word "SEAL" next to the names and signatures of Louis and Gerry on the Power to Direct and the Option qualifies them as sealed documents.  Defendants, however, contend that a party disavowing a sealed contract should not benefit from the 20-year limitations period which would apply

---

[67] *See* 10 *Del. C.* § 8106; *Smith*, 2010 WL 412030, at *5; *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *6 (Del. Ch. Jan. 27, 2010), *aff'd*, 7 A.3d 485 (Del. 2010).

[68] *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 77 (Del. Ch. 2013) (alteration in original).

[69] *See Whittington*, 991 A.2d at 10 ("Under Delaware law, a contract under seal is subject to a twenty-year statute of limitations.").  There is no legislative enactment authorizing the 20-year limitations period; rather, it is a "matter of common law." *Id.* at 14 (Jacobs, J., dissenting).

[70] *Id.* (majority opinion).

when enforcing a sealed instrument.[71]  They argue that "[e]quity will not allow a party to sue to enforce the provisions of a contract that it likes, while simultaneously disclaiming the provisions that it does not."[72]

Furthermore, although direct Delaware precedential support is wanting, Defendants assert that fraud claims arising from classic sealed instruments (deeds and mortgages) have repeatedly been found to be governed by the three-year limitations period.[73]  Additionally, Defendants note that 10 *Del. C.* § 8109 has been interpreted to allow for fraud and other claims arising from the parties' negotiations to be governed by the three-year limitations period of Section 8106.[74]

The precedent Defendants cite is persuasive.  Gerry's claims alleging fraudulent inducement related to the Power to Direct and the Option will be assessed under laches based on the analogous three-year limitations period.[75]  This

---

[71] *See, e.g.*, *id.* at 7 (requesting that court enforce agreement at issue).

[72] *The Town of Smyrna v. Kent Cty. Levy Court*, 2004 WL 2671745, at *4 (Del. Ch. Nov. 9, 2004).

[73] *Maddox v. Isaacs*, 2013 WL 2297030, at *1-2 (Del. Super. May 7, 2013), *aff'd*, 74 A.3d 654 (Del. 2013) (barring fraud claim brought after 14 years on mortgage based upon 10 *Del. C.* § 8109); *Clarkson v. Goldstein*, 2007 WL 914635, at *4 (Del. Super. Feb. 28, 2007) (describing action for setoff as being subject to 20-year common law limitations period while claim for fraud, among other claims, was subject to three-year limitations period).

[74] *Vichi v. Koninklijke Philips Electronics N.V.*, 2009 WL 4345724, at *16 (Del. Ch. Dec. 1, 2009) (basing decision on differing statutory language describing a "cause of action aris[ing] from a promissory note").

[75] Gerry alleges that he was fraudulently induced to sign the agreements, based on a representation from Louis that he was only assigning his leasing rights.  Gerry Compl. ¶¶ 115-17, 122; *see also* [Gerry's] Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Gerry PAB") at 32 ("Defendants . . . wrongly ignore Gerry's 'leasing' limitation for the [Power to Direct] and the Option to Purchase, which are not integrated agreements and are, thus, voidable.").  Gerry also alleges that Louis preyed on Gerry's fears of his debts as a result of the Fahey litigation.

19

is consistent with general equitable principles that would not allow Gerry to disaffirm the entire contract, while attempting to rely on its terms to receive a more favorable limitations period. Nonetheless, Gerry's claims to enforce the contract (for example, to recover unpaid consideration due under it)[76] are governed by the 20-year period for laches purposes.[77]

Because the Assignment of Interest was not executed under seal, the typical three-year statute of limitations period informs the laches analysis.[78] Nonetheless, tolling, if applicable, could alter the outcome.

2. Has Gerry Pled Facts Justifying Tolling?

Gerry contends that he has alleged grounds for both equitable tolling and fraudulent concealment and therefore the limitations period for his challenges to the Power to Direct, the Option, and the Assignment of Interest should be tolled until the time when Louis asserted powers under the agreements. Defendants

---

Gerry Compl. ¶¶ 108-15. Both of these theories of fraud are barred by laches, in the absence of tolling.

[76] Gerry alleges that no consideration was received for the Power to Direct or the Option. Gerry Compl. ¶ 122. Gerry also contends that no documents exist which demonstrate that Louis exercised the Option. *Id.* ¶ 124.

[77] Defendants have not argued that laches would support a shorter limitations period in this context. *See, e.g.*, *Territory of U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 808 (Del. Ch. 2007).

[78] The challenges to the Power to Direct and the Option appear to be extraneous to the core dispute because neither the Power to Direct nor the Option, standing alone, empowers Louis to sign as CI Trust's trustee, the capacity in which he executed the written consents to authorize the Merger. Thus, regardless of whether both of these agreements are valid or invalid, without more, they do not appear to be capable of supporting Louis's proper execution of the written consents approving the Merger. The Assignment of Interest is the only document in the record, which, standing alone, formalizes Louis's office as trustee, and the validity of the Assignment of Interest is therefore critical in this dispute.

20

dispute these theories, but also argue that Gerry was on inquiry notice of any claims concerning these agreements.

"[N]o theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong."[79] A party is sufficiently aware when "persons of ordinary intelligence and prudence have facts sufficient to place them on inquiry notice which, if pursued, would lead to the discovery of the injury."[80]

Regardless of whether tolling may apply, Gerry was on inquiry notice of his claims concerning the Power to Direct and the Option. He has not alleged that he was inebriated when signing these documents. All of Gerry's concerns relating to these agreements could have been addressed after they were signed. Gerry's claim that Louis fraudulently represented that the agreements were limited to leasing rights would have been belied by the plain terms of the agreement. A person of ordinary intelligence and prudence who signed those agreements and who received a representation that they only related to leasing rights, would inquire as to the discrepancy between the language of the contracts and the oral representation. Gerry's roughly ten-year delay in bringing these claims is well outside the analogous three-year limitations period. This unreasonable delay has unfairly

---

[79] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).
[80] *Eluv Holdings (BVI) Ltd. v. Dotomi, LLC*, 2013 WL 1200273, at *7 (Del. Ch. Mar. 26, 2013) (citations and alterations omitted).

prejudiced Defendants. Thus, Gerry's claims of fraud concerning the Power to Direct and the Option are barred by laches.[81] However, Gerry's claims to enforce the agreements have not exceeded the analogous limitations period of 20 years and may proceed.

In contrast, Gerry has pled particular facts in support of his tolling claim concerning the Assignment of Interest; although his claims may be difficult to prove later in the proceedings, his complaint supports tolling on the grounds of fraudulent concealment. His incapacity, when executing the agreement, may have meant that he had no knowledge of its existence. If Louis did assert to Gerry that he was receiving distributions from CI-LLC, then those additional misrepresentations could have dissuaded Gerry from inquiring into whether his interest in CI-LLC had been alienated.

The Court cannot conclude that a person of ordinary intelligence and prudence would have been on inquiry notice concerning the Assignment of Interest. Gerry has alleged that he was inebriated when he signed the Assignment of Interest, and, therefore, he has no recollection of the event.[82] He further claims that Louis backdated the document in which Gerry became CI Trust's trustee after McCollom's resignation and seems to imply that this, along with Gerry's

---

[81] Defendants' additional challenges to Gerry's fraud claims arising from these agreements are therefore not considered in the rest of the opinion as they are barred by laches.
[82] Gerry Compl. ¶ 34.

appointment of Louis as trustee, was one of the documents signed while he was inebriated.[83]  Finally, Gerry claims he never received distributions from the Company because he believed, based on misrepresentations by Louis, they were accumulating in an account for the benefit of his children.[84]

Although one might think that a reasonably diligent person would have inquired into whether or not the funds actually made it into an account for his children's behalf, different families might have different ways of managing intra-family finances.  The Court cannot conclude at this stage of the proceedings that Gerry's trust in Louis in this instance was unwarranted at the time or that he was on inquiry notice in these circumstances.  Thus, Gerry has pled facts demonstrating that the analogous limitations period for the Assignment of Interest should be tolled until Louis executed the Merger.  He may proceed in challenging this transfer in this proceeding.[85]

Finally, Defendants argue that Gerry was on notice concerning the 2000 and 2001 transactions because Joseph wrote contemporaneous letters to Gerry which demonstrate that both parties knew of the transactions.  Joseph wrote that "it was obvious that Louis was buying you then" and "[i]t's a shame that a couple of

---

[83] *Id.* ¶¶ 34-35.
[84] *Id.* ¶ 134.
[85] Of course, Defendants may be able to come forward with evidence demonstrating that Gerry had notice of the Assignment of Interest on a developed record and thereby prevail on a laches defense.

hundred thousand dollars could sway you."[86]  These statements only bear upon the Assignment of Interest because the Court has already concluded that fraud claims based upon the Power to Direct and the Option are barred.  These letters also do not alter the Court's analysis concerning the Assignment of Interest, because both letters predate the agreement's execution and thus were incapable of putting Gerry on inquiry notice of it.[87]

## B. *Did the CI Trust Permit Gerry to Transfer his Interest to Louis?*

Defendants next argue that the CI Trust agreement permits Gerry's transfer of his interest to Louis.  Their arguments are reasonable, but their assertions only go as far as the plain language of the trust agreement upon which they rely.  The parties debate which statutory provisions are applicable to CI Trust, but ultimately seem to agree that their arguments are based on the terms of the trust agreement's spendthrift provision.[88]

---

[86] *See* Gerry Compl., Ex. 5; Joseph Compl., Ex. 7.  Moreover, the letters sent from Joseph to Gerry in 2000 and 2001 do not make clear that Gerry was on inquiry notice of these matters. Although the letters refer to a maneuver, they are not clear that the maneuver concerned any of the Power to Direct, the Option, or the Assignment of Interest.  The Court may not draw such inferences at this time.

[87] The letters are dated September 15, 2000, and June 11, 2001.

[88] Gerry PAB at 26 ("Defendants state (correctly) that a beneficial owners' interest in a statutory trust is freely transferable except to the extent otherwise provided in the governing instrument of the statutory trust." (citations and emphasis omitted)); Defs.' Reply Br. in Further Supp. of Their Mot to Dismiss [Gerry's] Verified Compl. ("Gerry DRB") at 16 ("At bottom, Gerry contends that Sections 2.01 and 2.02 of the Trust Agreement prohibit (a) him serving as both Trustee and Beneficial Owner, and (b) a transfer during his lifetime."); *see also* 12 *Del. C.* § 3805(d) ("A beneficial owner's beneficial interest in the statutory trust is freely transferable except to the extent otherwise provided in the governing instrument of the statutory trust.").

24

The spendthrift provision provides:

> The interest of the Beneficial Owner in either the income or the Trust Property of the Trust shall not be alienated in any manner, assigned, encumbered, or transferred, in whole or in part, by Beneficial Owner without the express written consent of the Trustee, which consent may be given or withheld in Trustee's sole and absolute discretion.[89]

Defendants refute many of Gerry's arguments concerning his inability to alienate his interest in CI Trust,[90] but do not completely address his argument that the Assignment of Interest would be invalid without the approval of CI Trust's trustee.[91] If Gerry demonstrates defects with the manner in which he became CI Trust's trustee, for example through his claims of backdating, then he may accurately state that CI Trust's trustee did not approve the Assignment of Interest, as is required by the spendthrift provision.[92] Thus, Gerry's allegation that McCollom, as trustee, withheld his consent and did not give express written consent to the 2000 and 2001 transactions, could entitle Gerry to relief and therefore cannot be dismissed.[93]

---

[89] Gerry Compl., Ex. 7 § 2.01; Joseph Compl., Ex. 9 § 2.01.

[90] Defendants argue that CI Trust's plain language permits Gerry to alienate his interest, that the transfer of the Power to Direct and the Option did not require trustee consent, that one person may be both CI Trust's trustee and beneficial owner, and that Gerry consented to the transfer or waived any notice requirements during the transfer.

[91] *See* Gerry DRB at 14-24.

[92] This requirement was set forth in the Option which states that "Louis acknowledges that no transfer in the CI Trust can occur without the consent of the Trustee." Gerry Compl., Ex. 6, at 7, § 6; Joseph Compl., Ex. 8, at 7, § 6.

[93] Gerry Compl. ¶ 54.

Similarly, even if McCollom made Gerry the trustee in early December of 2001, Gerry's allegation that he was inebriated when he approved the Assignment of Interest, could also have precluded Gerry from validly consenting, as trustee of CI Trust, to alienate his interest.[94] Because of the factual disputes Gerry alleges concerning the validity of the execution of the documents underlying the Assignment of Interest, the Court cannot evaluate whether those acts complied with the terms of CI Trust permitting Gerry to alienate his interest.[95] The Court cannot now conclude that the transfer of Gerry's interest was effective.

## C. *Did Gerry Fail to Plead Fraud with Particularity?*

Defendants next argue that Gerry's claims concerning the Christmas party, his failure to receive distributions, and his children's school tuition are not averred with sufficiently particularity. Court of Chancery Rule 9(b) requires fraud claims be pled to include "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[96]

---

[94] *Id.* ¶¶ 34-36, 55.

[95] The Court need not determine whether the Power to Direct violated CI Trust's spendthrift provision, because the Power to Direct alone could not empower Louis to act as CI Trust's trustee. Furthermore, the Court will reserve judgment on the parties' arguments concerning whether Gerry may be CI Trust's beneficiary and trustee at the same time until the predicate factual issues are resolved.

[96] *Abry P'rs V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).

Here, the Court concludes that Gerry's claims involving his intoxication are averred with particularity: he describes where and when Louis allegedly took advantage of his inebriated state to induce him to execute an assignment to transfer control of CI Trust's interests.[97]  Whether Louis caused Gerry to become intoxicated is not essential to Gerry's fraud claim, and Gerry need not declare his intent to return any consideration he received in order to satisfy pleading requirements.  Additionally, Gerry claims that he was incapable of comprehending the subject and nature of the contract and thereby pleads more than "merely being under the influence of intoxicating liquor."[98]

The Court agrees with Defendants that Gerry's claims surrounding the distributions and the school tuition for his children are not averred with sufficient particularity.  Both claims appear to be predicated upon one paragraph statements which generally aver "misrepresentations"[99] or that "Louis let Gerry believe for years" that his children's tuition was being paid.[100]  These general pleadings do not contain the detail necessary to apprise Defendants upon which specific incidents Gerry's claims are based.[101]

---

[97] Gerry Compl. ¶¶ 139-40.

[98] *See* Defs.' Br. in Supp. of Their Mot. to Dismiss [Gerry's] Verified Compl. at 40 (citing *Poole v. Hudson*, 83 A.2d 703, 704 (Del. Super. 1951)).

[99] Gerry Compl. ¶ 134.

[100] *Id.* ¶ 134.

[101] However, to the extent these are simply supporting details for Gerry's other claims, he is still entitled to develop arguments based upon them; they simply are not a separate basis for stating a fraud claim against Defendants.

D. *Is Gerry's Claim for Unjust Enrichment Barred?*

Defendants' remaining arguments for dismissal of Gerry's complaint are premised upon their hope that the Court would determine that the Assignment of Interest cannot be challenged at this time. However, because Gerry's challenge survives, the Court cannot resolve Defendants' remaining arguments in their favor. Defendants correctly point out that if an unjust enrichment claim arises from a relationship governed by contract, then the contract alone provides the plaintiff's remedies.[102] And, because Gerry is barred from rescinding the Power to Direct and the Option based on fraud, he has no entitlement to unjust enrichment concerning these two documents: the contracts alone provide Gerry's remedies. However, Gerry argues that the Assignment of Interest is invalid and thus Gerry may still have a right to the alleged unpaid distributions.[103] The unjust enrichment claim relating to the Assignment of Interest survives.

E. *Does Gerry Lack Standing to Challenge the Merger?*

Defendants argue that Gerry lacks standing to challenge the Merger because he has no rights in CI Trust. The Court, when considering a plaintiff's argument for standing, will consider the following:

---

[102] *See Nemec v. Shrader*, 991 A.2d 1120, 1131 (Del. 2010).
[103] To the extent the contract is found to be valid and it explains the absence of the allegedly converted distributions, Defendants' argument will likely render this cause of action superfluous.

28

(1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[104]

Defendants' challenge to Gerry's standing is premised on their conclusion that Gerry has no remaining interest in CI Trust. However, because the factual allegations entitle Gerry to challenge the Assignment of Interest alienating his interest in CI Trust, the Court cannot conclude that he has no standing to attack the Merger or to assert rights under CI-LLC's operating agreement. If Gerry successfully demonstrates that the assignment to Louis was invalid, then his remaining interest in CI Trust would permit him to assert rights in CI-LLC and to challenge the Merger's fairness. It is premature to dismiss Gerry's claims for lack of standing.

Having considered Defendants' arguments to dismiss Gerry's complaint, the Court turns to Defendants' arguments seeking dismissal of Joseph's claims.

---

[104] *Dover Historical Soc. v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) (citations omitted).

F. *Does Joseph Have Standing to Challenge the 2000 and 2001 Agreements Between Louis and Gerry?*

Defendants argue that Joseph lacks standing to challenge certain transactions such as the 2000 and 2001 transactions because he was not an intended beneficiary of those agreements. The Court reviewed the general test for standing above, but further recognizes that an analysis of standing "begins with recognition of the general rule that strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party."[105]

Joseph attempts to distinguish these cases and essentially states that because he was injured by the 2000 and 2001 transactions that he has standing to challenge them.[106] He contends that because CI Trust's three percent ownership of CI-LLC was to function as a tie-breaking vote between Joseph's and Louis's equal ownership of the Company, that he is therefore an intended beneficiary. His arguments are unavailing; the Court will look to the text of the business trust agreement and respect its plain language. Joseph is not a party to the agreement or granted any rights by it. Section 10.04 of the CI Trust agreement plainly articulates its drafter's intent to exclude third-party beneficiaries.[107] Thus, Joseph cannot challenge the agreements between Gerry and Louis in 2000 and 2001.[108]

---

[105] *Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 268 (Del. Ch. 1987) (citations omitted).
[106] *See* [Joseph's] Answer in Opp'n to Defs.' Mot. to Dismiss *("*Joseph PAB") at 46-47 & n.47.
[107] Gerry Compl., Ex. 7 § 10.04; Joseph Compl., Ex. 9 § 10.04 ("Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Trustee and

However, the effect of this conclusion, as a practical matter for this case, is limited. First, the two challenges to these transactions will be consolidated and several of Gerry's claims to these transactions survive the motion to dismiss. Second, Joseph's inability to challenge the underlying transfer does not leave him without rights concerning the assignment of interests in CI-LLC. Section 6.01 of CI-LLC's operating agreement has expansive language indicating that any transfer of any portion of a member's interest CI-LLC must be approved by a majority vote or it will not be valid.[109] Joseph, as a member of CI-LLC, is certainly an intended beneficiary of this provision and thus, even if he is unable to challenge the formation of the underlying agreements, he may challenge whether those transfers of membership interests were approved in accordance with CI-LLC's operating agreement.

G. *Has Joseph Stated a Claim that the Merger was Invalid?*

Defendants repackage a variety of arguments made elsewhere and also contend that the Merger was validly completed because Louis and others aligned with him owned a majority of the voting power of CI-LLC. Joseph, however, has contested the validity of both the transfer of interest from Louis to Louis L.P. and

the Beneficial Owner any legal or equitable right, remedy or claim in the Trust Property or under or in respect of this Agreement or any covenants, conditions or provisions contained herein.").
[108] The Court does not address Defendants' arguments that Joseph's challenges to the 2000 and 2001 agreements are barred by laches because he lacks standing to challenge them. Defendants do not assert a laches defense to the challenge to the transfers under the terms of CI-LLC's operating agreement.
[109] Gerry Compl., Ex. 1 § 6.1; Joseph Compl., Ex. 2 § 6.1.

the validity of Gerry's transfer of his interest in CI Trust to Louis under the terms of CI-LLC's operating agreement. Defendants' arguments that these acts were ratified before the Merger or that their affiliated entities owned a majority of CI-LLC's interests ignore the argument that their power to wield a majority voting interest capable of ratifying the earlier transfers is dependent upon compliance with CI-LLC's operating agreement. If the transfer of interest in CI Trust were invalid under the operating agreement, a properly-constituted majority would not have ratified the transfer of interest of CI Trust or Louis L.P.'s membership interest.

Joseph claims that Louis's interests in CI Trust or Louis L.P. were never approved by majority vote granting them recognition under the Company's operating agreement.[110] It is reasonably conceivable that Joseph could prevail on this well-pled factual issue. Similarly, Defendants' argument, that because they control a majority of the economic interest they "could" have consented, is also unavailing.[111] The factual issue must be resolved as to whether they actually did consent as a necessary precondition to Louis validly exercising the transferred interests under the terms of the operating agreement.[112]

---

[110] Joseph Compl. ¶¶ 104-08.

[111] Joseph DOB at 21.

[112] Defendants also argue that the conversion claim must be dismissed if the Court finds that Defendants "complied with all statutory and other requirements and had the legal power to file the certificate of merger." Joseph DOB at 40. The Court has not found that, and thus this claim is not dismissed. Defendants' additional legal questions concerning the operating agreement's transfer of interest provision will be resolved by the Court upon a more complete record.

## H. *Did Joseph Fail to Plead Fraud with Particularity?*

Defendants also argue that Count VII of Joseph's complaint, alleging fraud arising from the agreement between Joseph and Louis from the 1990s to fairly divide the Capano properties, is not pled with particularity. Joseph appears to argue that he pled equitable fraud or promissory fraud and thus his claims should survive. However, these arguments cannot salvage his claim. Joseph pled fraud concerning the agreement from the 1990s.[113] When Joseph describes the formation of the alleged agreement, he does not describe any fraudulent statements Louis made, and instead says that Louis "reneged."[114] A party's later decision to renege is not the same as a party's affirmative fraudulent statement.

Joseph also claims Louis represented to Joseph that they would divide all mutually held Capano assets. Joseph alleges that Louis "did not intend to divide and allocate" the Capano assets fairly and equitably and that Louis "fraudulently ousted Joseph" during the Merger.[115] These statements, in the context of a vague agreement made approximately 20 years ago, are not sufficiently precise to meet

---

[113] Joseph Compl. ¶ 346. Joseph's arguments are a bit hard to follow here. He also alleges, under his fraud claim, that he has not received all assets owed to him and has not been compensated for his interest in CI-LLC. *Id.* ¶¶ 350-51. However, these latter allegations do not assert that Louis made misrepresentations, thus the Court only analyzes Joseph's claims under the 1990 agreement. Joseph directs the Court to various paragraphs of his complaint, which also do not allege fraudulent statements. Joseph PAB at 41 (citing Joseph Compl. ¶¶ 70, 167-181, 202). The closest he comes to doing so is his statement that Louis left him in the dark about the Merger. However such an allegation is also not an alleged fraudulent statement.

[114] *See* Joseph Compl. ¶¶ 158-66.

[115] *Id.* ¶¶ 348-49.

our law's particularity standard. Joseph has not sufficiently alleged the time or place of Louis's alleged misrepresentation. Moreover, he has not alleged that Louis's claim was untrue at the time it was made and his general claim that the two worked side-by-side for a number of years is not a fraudulent representation. He has failed to allege particularized facts which "allow the inference that, at the time the promise was made, the speaker had no intention of performing."[116] He only asserts generally that Louis continued to operate the Company out of respect for Marguerite's wishes. This is not a particularized pleading that in the 1990s Louis had no intention of performing. Count VII of Joseph's claim shall be dismissed.[117]

## I. *Is Joseph's Specific Performance Claim Based upon the Oral Agreement from the 1990s Barred by Laches or Is the Claim Too Indefinite?*

Defendants also argue that Joseph's claims arising from the agreement from the 1990s are barred by laches. Their arguments are premised on the view that Joseph's cause of action arose at the time the agreement was reached sometime between 1992 to 1994. Joseph's pleadings concerning this agreement are quite minimal and prevent the Court from ascertaining the parties' obligations under the alleged contract. Joseph has alleged that Louis reneged on the agreement only after Marguerite's death.[118] Thus, under Joseph's alleged theory, the agreement

---

[116] *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009).
[117] The Court therefore need not assess Defendants' other arguments concerning whether this count states a claim.
[118] Joseph Compl. ¶ 160.

was breached when Louis reneged and his cause of action for breach accrued at that time. His delay therefore was not as unreasonable as Defendants claim.[119]

Although perhaps a vague pleading, Louis has notice of the claim. When the pleadings are accepted as true, Joseph has a possibility of recovery and thus the claim cannot be dismissed. Furthermore, the Court would typically determine whether a plaintiff delayed too long in exercising his contract rights by reference to the contract itself.[120] Such information is not yet before the Court.[121] Thus, Joseph's specific performance claim based on this agreement survives.

J. *Has Joseph Stated a Claim for Aiding and Abetting?*

Joseph alleges that the Defendants (other than Louis) aided and abetted Louis's breaches of fiduciary duties owed to him and AAMM Trust. Defendants assert that a "corporation generally cannot be deemed to have conspired with its

---

[119] Defendants again argue that the letters between Joseph and Gerry indicate that Joseph knew the oral agreement from the 1990s had been breached. As noted earlier, when inferences are drawn in Joseph's favor, the letter is inconclusive on this point. Although he complains that he was supposed to have received certain properties five years ago; that does not mean the agreement was breached or that Louis did not find some other way to convince Joseph that he still intended to perform on the agreement.

[120] *Cantera v. Marriott Senior Living Servs., Inc.*, 1999 WL 118823, at *7 (Del. Ch. Feb. 18, 1999). Similarly, Defendants' argument that specific performance invokes a stricter requirement for prompt action by the plaintiff also requires some reference to the underlying agreement to determine whether Joseph's actions were prompt. Joseph DOB at 30. Defendants are entirely correct that Joseph will need to meet a heightened burden of persuasion to obtain an order requiring specific performance; that said, for now, the requirements of notice pleading have been satisfied with respect to Joseph's specific performance claim regarding this agreement.

[121] Defendants' arguments may well prove to be meritorious once they can submit evidence proving that Gerry and Joseph slept on their rights or that the Defendants otherwise complied with the terms of the agreements at issue. The complaints of Gerry and Joseph certainly appear to implicate as many factual issues as possible, perhaps in order to survive motions like those Defendants have filed. Nonetheless, whether intentional or not, the complaints admit of factual issues which the Court may not resolve at this stage of the proceedings.

wholly owned subsidiary, or its officers and agents."[122] However, they ignore that *Transamerica* contemplated that exceptions to that rule exist and also ignore a later case which suggests that *Transamerica*'s holding was likely in part motivated by particularly weak pleadings in that case.[123] As *Allied Capital* explained, "it is uncontroversial for parent corporations to be subjected to claims for aiding and abetting breaches of fiduciary duty committed by directors of their subsidiaries."[124] Joseph's claims may not be dismissed simply because Defendants may be affiliated entities.

Defendants also appear to argue that Louis, in his role as trustee of CI Trust or as general partner of Louis L.P., was acting as an agent of Louis in his role as a fiduciary of CI-LLC. They also argue that Louis III was an agent of Louis, as a fiduciary of CI-LLC. Defendants therefore conclude that an agent cannot aid and abet its principal and Joseph's claims must be dismissed.[125] However, they mischaracterize these relationships. Louis, in his capacity as general partner of Louis L.P. and as trustee of CI Trust, was not an agent of CI-LLC. Similarly, Louis III was a member of CI-LLC, not an agent of it or of Louis in his capacity as CI-LLC's de facto manager. The Court may not dismiss Joseph's claims solely on this theory.

---

[122] *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006).
[123] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1037 n.37 (Del. Ch. 2006).
[124] *Id.* at 1038.
[125] *See* Joseph DOB at 39-40.

Joseph's claims may border on conclusory, because his allegations against the Defendants are nearly identical to his claims against Louis describing his breaches of fiduciary duty.[126] However, based on the general arguments forwarded by Defendants, his aiding and abetting claims survive.

K. *Is Joseph's Books and Records Request Deficient?*

Defendants ask the Court to deny Joseph's books and records request because he has not made a proper demand and because Joseph has no rights to Newco's books and records. Joseph is not a member of Newco and the rights he had under CI-LLC's operating agreement do not grant him rights to Newco. Similarly, he requests access to the books and records of other Capano entities in which he bears an interest; these entities are not Defendants in this litigation and Joseph has not adequately identified those entities or explained his relationship to them. Similarly, CI-LLC is not presently in existence; if Joseph is successful in unwinding the Merger, he may separately request CI-LLC's books and records at that time. Thus, Joseph's books and records request is denied.[127]

L. *Has Joseph Abandoned Certain Claims?*

Defendants argue that the Court lacks jurisdiction to grant Joseph punitive damages and that some of Joseph's claims are derivative claims which he cannot

---

[126] On the reasonable conceivability standard Joseph's pleadings may just barely provide notice to Defendants of his claims and thereby survive the motion to dismiss.

[127] With that conclusion, the Court need not consider whether a books and records claim has, or should have, a place in litigation of this nature.

37

assert after the Merger. Joseph did not respond to these arguments in his answering briefs or at oral argument and thus he has abandoned those claims. Thus, Count III ¶ 332.b (diversion of certain assets), Count VIII (waste), Count XI (appointment of a receiver), Count XII (constructive trust), and Count XIII (injunction) will be dismissed.[128] However, to the extent any of these claims were remedies to which Joseph is otherwise entitled under his surviving claims, he may nonetheless seek such a remedy despite his failure to respond to Defendants' arguments on these points.

M. *Are Plaintiffs' Claims for Rescission Barred?*

Defendants also argue that Gerry and Joseph are precluded from a remedy of rescission because CI-LLC has entered into numerous transactions with third parties which cannot be undone. These arguments are premature where the factual record is devoid of CI-LLC's history. Again, Defendants' argument may prove, after additional factual development, to be compelling, but the Court cannot yet conclude that Plaintiffs have no possibility of recovery which could include such a remedy.[129]

---

[128] *See e.g.*, *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *7 (Del. Ch. Jan. 11, 2010) ("Plaintiffs quietly abandoned this claim in their brief in opposition to defendants' motion to dismiss, by failing to address or respond to defendants' arguments in their motion to dismiss.").

[129] Defendants assert generally in their opening brief supporting their motion to dismiss Joseph's complaint that mergers typically cannot be unwound. Joseph DOB at 28-29. Our opinions considering rescission claims include statements to that effect, but they also examine more closely the circumstances of the particular merger such as how long ago it occurred and how intertwined the former entities have become. This sort of analysis is not set forth by Defendants.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are granted in part and denied in part. Counsel are requested to confer and to submit an implementing form of order.