COURT OF CHANCERY
OF THE
STATE OF DELAWARE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

LOREN MITCHELL
MAGISTRATE IN CHANCERY

Date Submitted:  October 24, 2026
Date Decided:  February 27, 2026

Lacy E. Holly, III, Esquire
Holly & Morton, L.P.
603 Main Street
Odessa, DE 19730

Brian T. Riggin, Esquire
Parkway Law LLC
3171 duPont Parkway, Suite B
Middletown, DE 19709

RE:  *Michael Kelvin Van Horn v. Townsend Real Estate, et al.*,
C.A. No. 2024-0291-LM

Dear Counsel:

In this property dispute between Michael Van Horn and Townsend Real Estate Land Trust, the factual background centers on Michael Van Horn's claim of adverse possession.  Van Horn asserts that his family has maintained continuous, open, and adverse use of the disputed property dating back to the 1940s, thereby meeting the criteria for adverse possession.  Townsend Real Estate denies these claims, arguing that Van Horn's use of the property was neither adverse nor exclusive.  In analyzing the legal findings, the Court finds that Van Horn's possession meets the necessary criteria for adverse possession under Delaware law.  As such, I find in favor of Van Horn and vest title to the property in him through adverse possession.

This is my Final Report.

## I.  FACTUAL BACKGROUND[1]

This case involves a property dispute between Michael Kelvin Van Horn ("Petitioner"), and Townsend Real Estate & Business Development 315/317 Land Trust ("Respondent").[2]  Petitioner resides at 567 Walnut Street, Townsend, Delaware.[3]  The Trustee for the Respondent is County Real Estate & Business Development, LLC, a Wyoming Limited Liability Company, managed by Harry Jennings.[4]

The disputed property in question is an approximately 50 feet by 100 feet portion of  land located within 315 and 317 Gray Street, Townsend, Delaware, identified by Tax Parcel No. 25-001.00-044.[5]  The evidence reflects that this disputed portion lies directly across Walnut Street—also known as Fulton Street—from Petitioner's residence at 567 Walnut/Fulton Street and sits between neighboring

---

[1]  The facts in this Report reflect my findings based on the record developed at trial on September 24, 2025.  I grant the evidence the weight and credibility I find it deserves. Citations to the record are in the form of Docket Item ("D.I.") and identified by their entry number.  Citations to the trial transcript are in the form of "Tr. __."  Deposition transcripts are cited as "[Last Name] Dep. Tr. __."  The parties submitted joint exhibits numbered 1-26.  Citations to the joint exhibits are in the form of "JX__."

[2]  D.I. 1 at 2.

[3]  *Id.*

[4]  *Id.*

[5]  *Id.*

properties historically associated with members of the Van Horn family.[6] Photographs admitted at trial depict the disputed area as an open, grassy lot containing a white garage structure and bounded in part by fencing.[7]

On July 28, 1959, 315 Gray Street was transferred from Roland R. Reynolds, Jr. to Ralph G. Faries, Sr. and Ralph G. Faries, Jr.[8] The property was owned by the Faries until 2019.[9] On November 15, 2019, Ralph G. Faries, III conveyed the parcel to Mark D. Faries.[10] On that same date, Mark D. Faries conveyed the property to Townsend Real Estate & Business Development Ltd.[11] Thereafter, by quitclaim deed dated February 14, 2023, Townsend Real Estate & Business Development Ltd. conveyed its interest to Townsend Real Estate & Business Development 315/317 Land Trust, with County Real Estate & Business Development, LLC serving as Trustee.[12]

---

[6] Tr. 13:24–14:21; Tr. 21:11–24:1.

[7] JX 11.

[8] JX 1.

[9] Tr. 47:8–50:10.

[10] JX 2.

[11] JX 3.

[12] JX 4.

On March 25, 2014, Petitioner purchased 567 Fulton from his grandmother's estate.[13]  The property was previously owned by his grandmother, Harriet Anna Van Horn, who owned the property since 1942.[14]  The Petitioner's grandparents  began to use the  disputed area sometime after they purchased their property.[15]  Petitioner's grandfather erected a garage where he parked his vehicle and also erected a fence.[16] After Malvin Van Horn passed away, Harriet continued to use the garage to park her vehicle.[17]   Family  members  subsequently  replaced  the  original  garage  and  also maintained the disputed property with landscaping and snow removal.[18]

When Petitioner purchased the property in 2014, he believed the disputed portion of land across the street was his, and continued to treat it as his own in a

---

[13]  JX 24

[14]  The property was acquired by Malvin and Harriet Van Horn in 1942.  JX 6.  After Malvin Van Horn died in 1967, the property was held by Harriet Van Horn.  JX 7.

[15] Petitioner testified that he believed his grandparents used the disputed property since they purchased their property at 567 Walnut Street in 1942 but could not definitively confirm this because it predates his birth. Tr. 94:2–95:9; Tr. 122:13–123:21.  The earliest Petitioner observing the disputed property being used was when he was six years old, around 1965 or 1966. Tr. 34: 6–23;  Tr. 50:14–19.  Terry Van Horn, who is older than Petitioner, has recollections of the disputed area being used by their grandparents as early as 1950 or 1951. Tr. 122:13–123:21;  Tr. 125:13–126:4.

[16] Tr. 105:2–106:2;  Tr. 127:9–24.

[17] Tr. 107:21–108:13.

[18]  *See* Tr. 35:11–41:4;  Tr.135:12–138:3;  *see* Van Horn, Mark Dep. Tr. 19:16–20:6;  Van Horn, Terry Dep. Tr. 14:21–19:6.

similar way that his grandparents used the disputed land.[19]  Petitioner testified that with help from his brother, he constructed the existing white garage around the same location during his grandparents' ownership of the adjacent Walnut/Fulton Street property.[20]

At some point after acquiring the property in 2014, Petitioner's wife was approached by Mr. Jennings who asserted he had a deed to the disputed land.[21]  After this encounter, the parties subsequently entered an agreement to resolve $1250 of back taxes with Petitioner making $50.00 monthly payments.[22]  Petitioner later increased the monthly payment amount to $75.00.[23]  Petitioner testified that these payments were made under duress, following threats and police involvement by Jennings.[24]  Petitioner claimed the payments were intended as a temporary measure

---

[19] Tr. 51:12–19.

[20] Tr. 23:11–24:4;  Tr. 36:1–20.

[21] A deed was never presented and it was later determined that Mr. Jennings did not have a deed to the land, but rather purports to have been assisting the record owners with managing their property.  Tr. 44:16–45:11;  Tr. 169:1–13;  Tr. 172:11–173:13.

[22]  Tr. 52:2–53:2;  JX 9 at 30 (Petitioner disputes the signature on this document is his); *see* JX 10 at 32;  *see* JX 18 at 292–302.

[23]  Tr. 150:6–19;  *see* JX 9 at 30 (Petitioner disputes whether the signature on this document is his);  JX 10 at 32;  *see* JX 18 at 303–11.

[24]  *See* Tr. 61:9–21;  *see* Van Horn, Michael Dep. Tr. 11:9–12:21.

to maintain peace rather than an acknowledgment of ownership.[25]   None of the payment memos referenced "rent."[26]

The record also contains a Commercial Lease Agreement, effective April 1, 2020, between Townsend Real Estate & Development Ltd. as "Landlord" and Michael Van Horn as "Tenant," purporting to lease the "back lot and garage of 315 Gray St." month-to-month for $75.00 per month.[27]   Petitioner testified that the signature on that document is not his, that he never agreed to such a lease, and did not use the premises pursuant to any landlord-tenant arrangement.[28]

The record presented at trial shows copies of multiple checks made payable to Townsend Realty and related entities in amounts consistent with the purported monthly rent.[29]   While Respondent relies on those checks as evidence of rental or lease payments, Petitioner contends that he issued those payments only after the dispute arose in 2014 and that he made them under threat of police involvement or

---

[25]   *See* Tr. 9:5–19.

[26]   *See* Van Horn, Michael Dep. Tr. 29:5–30:10.

[27]   JX 10.

[28]   Tr. 57:2–6; Van Horn, Michael Dep. Tr. 12:5–10.

[29]   JX 15 at 180–82;  JX 18.

civil confrontation in order to avoid further conflict, not as recognition of Respondent's ownership.[30]

At the end of 2023, Respondent actively marketed the property to sell. An offer for $110,000 was received in December 2023.[31] Additional offers followed on March 1 and March 14, 2024.[32] Realtor Candace Santoro, who listed the property in January 2024, testified that the title "got clouded" on March 26, 2024, upon receiving notice of this lawsuit.[33] She stated that buyer interest remained strong but that settlement could not proceed because of the *lis pendens* and ongoing litigation— not because of any prior delay.[34]

Petitioner filed this quiet title action on March 22, 2024, claiming ownership of property through adverse possession asserting continuous, open, and hostile use since the 1940s.[35] On that basis, he seeks a court order to quiet title in his name.[36] Respondent rejects these claims and has counterclaimed for breach of contract,

---

[30] Van Horn, Michael Dep. Tr. 32:18–33:9; Van Horn, Michael Dep. Tr. 12:14–21.

[31] *See* JX 25 at 351–53.

[32] *See* JX 25 at 338–47; *see* Tr. 221:2–223:5.

[33] *See* Tr. 239:20–240:14.

[34] *See* Tr. 240:17–19; *see also* Tr. 256:24–258:19.

[35] D.I. 2; D.I. 1.

[36] D.I. 1.

tortious interference, and slander of title, alleging that Van Horn recorded a *lis pendens* without merit, causing financial harm.[37]

## II. ANALYSIS

### A. PLAINTIFF'S CLAIMS

#### 1. Adverse Possession

The elements of adverse possession are well-settled. The claimant must show that they had open, notorious, exclusive and hostile possession of land continuously for the prescribed period.[38] "Importantly . . . the burden of proof for adverse possession is only [by] a preponderance of the evidence, rather than [by] clear and convincing evidence."[39] For reasons further explained below, Petitioner satisfied all required elements.

##### i. Continuous

Adverse possession must be continuous for a statutory period of 20 years.[40] "The Delaware Supreme Court previously . . . held that the 'uninterrupted and

---

[37] D.I. 18 at 8.

[38] *See Taraila v. Stevens*, 1989 WL 110545, at *1 (Del. Ch. Sep. 18, 1989); *Suplee v. Eckert*, 160 A.2d 590, 591–92 (Del. Ch. 1960); *see Ayers v. Pave It, LLC.*, 2006 WL 2052377, at *2 (Del. Ch. July 11, 2006).

[39] *Tumulty v. Schreppler*, 132 A.3d 4, 24 (Del. Ch. 2015).

[40] *Id.*

continuous enjoyment of land to constitute adverse possession does not require the constant use thereof.'"[41]

The evidence strongly supports a finding of continuous use. Since 1942, the Van Horns (singular "Van Horn" for Michael; plural "Van Horns" for Michael and his family members) have treated the disputed parcel as their own, engaging in a wide range of activities that reflect ongoing possession and care. It is true that there was no evidence to support that the Van Horns used the disputed property since 1942, however taking the testimony of Terry Van Horn as credible, the evidence reflects the Van Horns utilized the disputed property since at least the 1950s. Even if the Court were to use the 1960s, when the Petitioner has a more vivid recollection of his grandparent's use of the disputed property, the statutory time period has still been met. Historical records and family accounts indicate that the Van Horns have consistently mowed the grass, installed and maintained fencing, cut vegetation, erected a garage, parked vehicles, and stored personal belongings on the land.[42] These actions were not isolated or incidental. Rather, they were repeated over decades and carried out in a manner consistent with ownership.

---

[41] *Id.*

[42] *See* Tr. 32:1–41:3; *see* Van Horn, Michael Dep. Tr. 24:23–28:10; *see* Tr. 19:17–23:1; *see* Van Horn, Mark Dep. Tr. 19:2–22:17.

The concept of "tacking" also applies here. "In order to make up the prescriptive period, successive adverse use[] by different persons may be tacked [or combined], but there must be privity between such persons."[43] "The doctrine of tacking may be invoked where the 'predecessor in title was under the impression that she was conveying to the plaintiffs the property in dispute, and the plaintiffs were under the impression that by reason of the deed they were obtaining title to that property" even if the instrument does not convey legal title to the property.'[44]

The continuous use by the Van Horns, including the grandparents, sons, brothers, and grandson, has been uninterrupted except for natural family succession.[45] The Petitioner began using the property in 2014, following similar use by his brother Mark and, before that, by their grandmother and other family members, all of whom mowed the parcel, stored vehicles on it, and performed general maintenance.[46] This familial continuity reinforces the notion of an unbroken

---

[43] *See Treherne v. Forsight, LLC*, 2022 WL 2057563, at *7 (Del. Ch. June 6, 2022), *report and recommendation adopted*, 2022 WL 2533087 (Del. Ch. July 6, 2022); *Marta v. Trincia*, 22 A.2d 519, 521 (Del.Ch.1941).

[44] *See Treherne*, 2022 WL 2057563, at *7.

[45] The Van Horn family members believed they had possessed the property since at least 1942, exercised continuous and visible dominion over the land by constructing a garage, erecting a fence, parking vehicles, and making other improvements, and maintained uninterrupted possession through successive generations. Tr. 94:8–18; Tr. 19:14–20:7.

[46] *See* Tr. 32:1–41:3; *see* Van Horn, Mark Dep. Tr. 19:16–20:6; Van Horn, Terry Dep. Tr. 14:21–19:6.

chain of possession. At no point has the property been abandoned or relinquished. This uninterrupted chain of use underscores the family's commitment to the property and reinforces their claim through consistent and visible actions over the years.

### ii.    Exclusive Use

"The exclusivity element does not require absolute exclusivity. 'Exclusive possession means that the adverse possessor must show exclusive dominion over the land and an appropriation of it to his or her benefit.'"[47]

Here, the Van Horn family has exercised exclusive control over the property, as shown by witness testimonies and physical documentation, including photographs, maps, and diagrams demonstrating their exclusive acts such as parking vehicles, construction, erecting fencing, and performing maintenance.[48] These materials illustrate the family's dominion over the land. Witnesses, including Mark and Terry Van Horn, corroborated the family's exclusive use, affirming that no other neighbor constructed and maintained garages, and maintained fences over the years.[49] Moreover, testimony from Mr. Jennings that he parked on the disputed

---

[47] *See Tumulty*, 132 A.3d at 24.

[48] *See* Tr. 32:1–41:3; *see* Van Horn, Michael Dep. Tr. 26:7–27:22; *see* Van Horn, Terry Dep. Tr. 16:17–20:20; *see* JX 15 at 174; *see* JX 11 at 34–37.

[49] The record shows that the Faries family maintained fenced, enclosed areas on their portion of the larger parcel and stored equipment inside those fenced sections, including trucks and farm machinery, but none of those fences or equipment ever appeared on the

property on one to two occasions, is not sufficient to undermine the Van Horn's exclusive use of the property.

### iii.    Open and Notorious

Open and notorious possession requires that the use of the property be visible and apparent, providing notice to the true owner and the public. Secretive or hidden possession does not meet the criteria for adverse possession, as it fails to alert the owner to the adverse claim.[50]

In this case, the Van Horn family's use of the property has been both open and notorious. Their actions, including the construction of an original garage by Petitioner's grandfather and the later construction of a replacement garage by Petitioner and his brother, along with regular maintenance of the property and the building of a foundation on the land, were visible to neighbors and passersby and

---

disputed 50-by-100-foot portion used by the Van Horn family—activities that do not interrupt or negate the Van Horns' exclusive use of the specific disputed strip. Tr. 89:13–90:10; Tr. 100:21–102:19. Mr. Jennings did not dispute the Van Horns' historic use of the property. His assertion of a competing claim only began in 2014 or later. According to his testimony, Mr. Jennings started assisting the Faires around 2003 or 2004, but he did not become involved with the property until 2014. Tr. 81:6–9; Tr. 92:13–93:14; Tr. 173:11–13. This timeline further supports the Van Horn family's uninterrupted use of the property up to and beyond that point.

[50] *Bogia v. Kleiner*, 2019 WL 3761647, at *10 (Del. Ch. Aug. 8, 2019) (citations omitted).

reinforced their belief in ownership.[51]  The visible improvements and continuous use would have put the record owner on notice that another party was asserting ownership over a portion of their land.  This open and notorious use sufficiently notified the public of the Van Horns' adverse claim.

### iv.    Hostile Use

"Hostility refers to use of property in a manner that is inconsistent with the rights of the true owner, as if the adverse possessor owns the property."[52]  "A hostile claim goes against the claim of ownership of all others, including the record owner."[53]  This element simply requires the adverse possessor to use the property "as if it were his own, to the exclusion of all others."[54]

There is no record of any objection or assertion of title by prior owners before 2014.[55]  The family's belief in their ownership, based on longstanding tradition and

---

[51] *See* Tr. 32:1–41:3;  *see* Van Horn, Michael Dep. Tr. 26:7–27:22;  *see* Van Horn, Terry Dep. Tr. 16:17–20:20;  *see* JX 15 at 174;  *see* JX 11 at 34–37.

[52] *Beard v. Davis*, 2024 WL 357998, at *4 (Del. Ch. Jan. 31, 2024), *report and recommendation adopted*, 2024 WL 1214391 (Del. Ch. Mar. 20, 2024).

[53] *Tumulty*, 132 A.3d at 27 (quoting *Ayers*, 2006 WL 2052377, at *2) (internal quotations omitted).

[54] *Id.*

[55] *See* Tr. 170:10–22 (noting that the witness claimed authority over property prior to 2014 but offered no documentary evidence of ownership or authorization from the record owner at that time); *see also* Tr. 176:24–180:23 (testimony confirming Oliver Jennings LLC was not formed until 2025 and thus could not have conferred authority in 2014).

use, supports the Petitioner's claim that the Van Horn's use of the property was hostile and adverse to all others.

### v. Finality of Title Through Adverse Possession

Once adverse possession is established, any subsequent deed transfers by others are irrelevant, as the title is acquired by possession, not by inclusion in record deeds.[56] The case of *Ocean Baltimore, LLC v. Celebration Mall* serves as precedent, holding that once the elements of adverse possession are satisfied, the possessor's title is perfected, and any subsequent conveyances by others do not affect the possessor's title.[57]

Here, the Petitioner, with his predecessor in title, has demonstrated continuous, open, notorious, and hostile possession of the property for over 20 years, thereby meeting the statutory requirements for adverse possession in Delaware.[58]

---

[56] *See Ocean Baltimore, LLC v. Celebration Mall, LLC*, 2021 WL 1906374, at *8 (Del. Ch. May 12, 2021), *report and recommendation adopted*, 2021 WL 2165256 (Del. Ch. May 25, 2021) (rejecting respondent's focus on the chain of title and holding that the absence of the disputed area from Lot 18's record title, and its continued inclusion in Lot 20's, did not defeat adverse possession; explaining that lack of record title is inherent to adverse possession, that only ouster before the twenty-year period could have interrupted it, and that petitioner's predecessors were not required to include the area in later deeds or leases to retain title).

[57] *Id.* at *17, *21.

[58] *See generally* Van Horn, Mark Dep. Tr. 19:16–20:6; *see* Van Horn, Michael Dep. Tr. 25:14–28:19; *see* Tr. 32:1–41:3; *see* Van Horn, Michael Dep. Tr. 26:7–27:22; *see* Van Horn, Terry Dep. Tr. 16:17–20:20; *see* JX 15 at 174; *see* JX 11 at 34–37.

The Respondent's claim of permissive use is unsupported by evidence, rather, the evidence supports that the Petitioner's possession has been adverse for the prescribed period. Any alleged lease agreements are irrelevant, as they do not negate the continuous and hostile nature of the possession.[59] Furthermore, the payment of taxes by the Respondent does not undermine the Petitioner's claim, as tax payments alone do not constitute possession.[60]

## B. DEFENDANT'S COUNTERCLAIMS

The record reflects that the Respondent and the associated trust had no colorable legal ownership of the property when they made claims of title or marketed

---

[59] *See generally* JX 10 (Lease agreement effective April 1, 2020, between Townsend Real Estate & Dev. Ltd. (Landlord) and Michael Van Horn (Tenant), for the "back lot and garage of 315 Gray St.", term month-to-month, rent $75, is entered as an exhibit but Petitioner testifies the signature is not his and that he never agreed to such lease, nor used the premises under a lease); *see* JX 15 at 180–82 (depicting multiple check copies as exhibits and referenced as supporting evidence of rental or lease payments, including checks made payable to Townsend Realty and similar entities, in amounts consistent with the purported rent); *see* Van Horn, Michael Dep. Tr. 12:11–21 (explaining that payments were made under threat of police/civil confrontation).

[60] *See generally* JX 15 at 179 (a letter for $1250 back taxes – which was not acknowledged by Jennings). The Commercial Lease Agreement is an attempt to create an agreement but it is unclear, as this document was not signed by Michael Van Horn. *See generally* JX 15 at 178 (the Commercial Lease Agreement); Van Horn, Michael Dep. Tr. 12:5–10. Petitioner made monthly payments called for by the parties' dispute, but he specifically denied being a tenant, denied that the written agreements created a formal landlord/tenant relationship, and considered his payments to be for continued possession/use "under duress" and not voluntarily as a tenant. *See* Van Horn, Michael Dep. Tr. 17:1–18:12; Tr. 61:9–21; *see* Van Horn, Michael Dep. Tr. 11:9–12:21; Tr. 53:15–54:20.

the property before 2023.[61]  Jennings failed to produce any documentary authority

for the period from 2014 to 2022.[62]  This was confirmed by his own trial testimony

and documents.[63]  Respondent maintained that he was a "manager" and "partner"

for the family under an oral contract.[64]  However, he provided no documentation

when challenged, relying instead on the assertion that he was helping out the family

as the basis for demanding money and asserting rights.[65]  The quitclaim deed into

the land trust, which would provide color of title, was not executed until February

---

[61] Testimony established that "Oliver Jennings LLC" was newly formed and filed with the Division of Corporations on January 2, 2025, and thus did not exist—and could not have conferred any authority—at the time of the disputed events in 2014.  Tr. 176:24–181:5.  Mr. Jennings described it as a reconstructed or reorganized entity created long after the original authority he claimed to have held since 2004.  Tr. 178:1–4.

[62]  Testimony established that "Oliver Jennings LLC" was newly formed and filed with the Division of Corporations on January 2, 2025, and thus did not exist—and could not have conferred any authority—at the time of the disputed events in 2014.  Tr. 176:24–181:5.  Mr. Jennings described it as a reconstructed or reorganized entity created long after the original authority he claimed to have held since 2004.  Tr. 178:1–4.

[63] *See Ocean Baltimore, LLC*, 2021 WL 1906374, at *8 (rejecting respondent's focus on the chain of title, holding that the absence of the disputed area from Lot 18's record title, and its continued inclusion in Lot 20's, did not defeat adverse possession, and explaining that lack of record title is inherent to adverse possession, that only ouster before the twenty-year period could have interrupted it, and that petitioner's predecessors were not required to include the area in later deeds or leases to retain title);  *see* Van Horn, Mark Dep. Tr. 19:16–20:6;  *see* Van Horn, Michael Dep. Tr. 25:14–28:19;  *see* Tr. 32:1–41:3;  *see* Van Horn, Michael Dep. Tr. 26:7–27:22;  *see* Van Horn, Terry Dep. Tr. 16:17–20:20;  *see* JX 15 at 174;  *see* JX 11 at 34–37.

[64]  *See* Tr. 172:11–174:21.

[65]  *Id.*

2023 and recorded thereafter, nine years after his first demand.[66] This lack of documentary authority and delayed acquisition of title bears directly on Respondent's breach of contract, tortious interference, and slander of title counterclaims, which are addressed below.

### 1.     Breach of Contract

To be successful on a claim for breach of contract, one must prove the following: (1) the existence of a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a causally related injury that warrants a remedy, such as damages or specific performance.[67] Absent ambiguity, courts interpret contract terms according to their plain and ordinary meaning.[68]

Respondent asserts that the Petitioner was a tenant of the property and bringing this lawsuit breaches the lease agreement.[69] However, because Petitioner has established a right to the property through adverse possession, Respondent's counterclaim for breach of contract is moot. As explained in *Ocean Baltimore*, once the elements of adverse possession are satisfied, the possessor's title is perfected,

---

[66] *See* JX 4 at 13–14; *see* JX 17 at 247–48; *see* Tr. 163:1–165:9.

[67] *See Namdar v. Fried*, 2025 WL 1604402, at *4 (Del. Ch. June 6, 2025).

[68] *See Trifecta Multimedia Hldgs. Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 470 (Del. Ch. 2024).

[69] D.I. 18 at 5.

and any subsequent conveyances by others do not affect the possessor's title.[70]

"Generally speaking, in order to interrupt the adverse possession period, the true owner must oust the adverse possessor, either by obtaining a judgment against the possessor or by entering the disputed property in a way that excludes him."[71] While the Respondent did inform the Petitioner that the disputed property belonged to the Faries, there is no evidence that the Respondent excluded the Petitioner from the property. Rather, Respondent attempted to create an agreement that would permit the Petitioner to continue to use the property for a fee. However, Respondent's attempt to grant permissive use of the property fails as the adverse possession requirements were already met by Petitioner's predecessor in title. Even if this were not the case, there is no evidence that Respondent had any authority to make an agreement in 2014 between the Petitioner and the record owners.

Accordingly, any claims premised on breach of lease or contractual obligations lack merit. Petitioner's ownership interest supersedes any alleged leasehold rights. Therefore, Petitioner's actions do not constitute a breach of

---

[70] *See Ocean Baltimore, LLC*, 2021 WL 1906374, at *8 (internal citations omitted) ("Respondent (and its predecessors) could not defeat the accruing adverse possession by attempts to shore up, or alert the adverse possessor of, its record title—only ouster or attempted ouster before the expiration of the 20-year period would have been sufficient.").

[71] *Tumulty*, 132 A.3d at 25 (citing *Acierno v. Goldstein*, 2004 WL 1488673, at *6 n.41 (Del. Ch. June 29, 2004)).

contract, and Respondent's claims for damages and termination of rights under the purported lease are unfounded.

### 2. Tortious Interference with Contractual Relations

In Delaware, to state a claim for tortious interference with contractual relations a plaintiff must satisfy five elements: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) an intentional act that caused a breach of the contract; (4) the act was unjustified; and (5) the act caused injury.[72] Respondent alleges that the property was listed to be sold, but due to the Petitioner's lawsuit, the Respondent had to reject offers and could not sell the property, constituting tortious interference with contract.[73]

Here, Petitioner and his family have consistently used and maintained the disputed land for decades, operating under the genuine belief that it was their property.[74] Although Respondent attempted to sell 315 Gray Street, which would include parts of the disputed property, in 2023 and 2024, the record contains no

---

[72] This legal framework is supported by Section 766 of the Restatement (Second) of Torts, (A.L.I. 1979), and the precedent set in *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

[73] D.I. 18 at 6.

[74] *See* Van Horn, Mark Dep. Tr. 19:16–20:6; *see* Van Horn, Michael Dep. Tr. 25:14–28:19; *see* Tr. 32:1–41:3; *see* Van Horn, Michael Dep. Tr. 26:7–27:22; *see* Van Horn, Terry Dep. Tr. 16:17–20:20; *see* JX 15 at 174; *see* JX 11 at 34–37.

evidence that the Petitioner took any action intended to interfere with the Respondent's property dealings. The three offers Respondent received predated this lawsuit and there is no evidence that the Petitioner discouraged potential purchasers or impeded sales of the property.

Petitioner's conduct was related to asserting an adverse claim to the property; he did not engage in improper acts targeting Respondent's contracts. The facts therefore do not support a claim of tortious interference with contractual relations as the Petitioner's actions were neither intentional nor unjustified in relation to the Respondent's contractual dealings. Moreover, although Respondent was able to show how much the property *could* sell for, Respondent failed to show that an actual contract to sell the property ever existed despite receiving multiple offers.[75]

As previously noted, once the elements of adverse possession are met, legal title vests in the possessor.[76] Accordingly, any claim predicated on tortious

---

[75] Tr. 239:6–241:21.

[76] *See Ocean Baltimore, LLC*, 2021 WL 1906374, at *8 (rejecting respondent's focus on the chain of title, holding that the absence of the disputed area from Lot 18's record title, and its continued inclusion in Lot 20's, did not defeat adverse possession, and explaining that lack of record title is inherent to adverse possession, that only ouster before the twenty-year period could have interrupted it, and that petitioner's predecessors were not required to include the area in later deeds or leases to retain title).

interference is without merit because no ouster occurred before the Petitioner's predecessor met the statutory requirement for adverse possession.

### 3. Slander of Title

The elements of a slander of title claim are: (1) the malicious; (2) publication of; (3) false matter concerning the state of title of property which; (4) causes special damages.[77] Respondent alleges that Petitioner's recording of a *lis pendens* was without merit, contained false statements, and resulted in financial harm.

Petitioner recorded the *lis pendens* on March 22, 2024.[78] Although Petitioner filed the *lis pendens* shortly after the Respondent listed 315 Gray Street for sale, Petitioner's actions in recording the *lis pendens* were based on a legitimate legal dispute. The absence of any false statements or malicious intent in the Petitioner's actions negates the Respondent's claim of slander of title as the *lis pendens* was a lawful and justified measure in the context of the ongoing legal proceedings. As such, Respondent's claim for slander of title and damages fails.

### C. AFFIRMATIVE DEFENSES

### 1. Estoppel

---

[77] *Tumulty v. Schreppler*, 2015 WL 1478191, at *20 (Del. Ch. Mar. 30, 2015).

[78] *See* D.I. 4.

Respondent argues that Petitioner is estopped from pursuing his claim due to executing the lease agreement.[79] Respondent asserts it relied on the lease agreement executed by Petitioner for the disputed property and used this information to acquire further property around that location.[80]

Estoppel applies "when a party by [their] conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to h[is] detriment."[81] To establish estoppel, the party claiming estoppel must show the following three elements: (1) he lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (2) he relied on the conduct of the party against whom estoppel is claimed; and (3) he suffered a prejudicial change of position as a result of her reliance.[82]

The most important aspect of the Respondent's estoppel claim is his reliance on the lease agreement. However, Petitioner acknowledges he entered into an agreement for back taxes, he denies entering into a lease agreement with the

---

[79] D.I. 44 at 6; D.I. 62 at 3.

[80] D.I. 62 at 13–14.

[81] *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990) (quoting *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903–04 (Del. 1965)).

[82] *Bantum v. New Castle Cty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 51 (Del. 2011) (citing *Waggoner*, 581 A.2d at 1136).

Respondent for the disputed land.[83] Respondent confirms this when he acknowledged that the first lease agreement in 2014 was not executed by the Petitioner, rather by Petitioner's son under Respondent's belief that Petitioner's son was the owner of the property.[84] Petitioner subsequently confirmed that the 2020 lease agreement is not his signature.[85] It is perplexing that Respondent asserts reliance on an agreement he admits was not signed by the Petitioner. Even if I were to consider the 2020 agreement, Petitioner credibly testified that he also did not sign this agreement. Respondent's burden to prove he relied on Petitioner's conduct to his detriment cannot be met as Petitioner's conduct does not support that he willingly entered into an agreement showing that he acknowledges Respondent's right to the disputed property of which Respondent detrimentally relied on.

### 2. Laches

The Respondent asserts that Petitioner's claim should be barred by the doctrine of laches. Laches bars an action in equity if: "[t]he plaintiff waited an unreasonable length of time before bringing the suit and . . . the delay unfairly

---

[83] Tr. 87:3–6.

[84] Tr. 149:22–150:5.

[85] Tr. 87:3–6.

prejudices the defendant."[86]   Therefore, laches generally require proving three elements: "first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant."[87]

Beginning in 2014, when Petitioner started making monthly $50.00 payments toward $1250 back taxes, Petitioner became aware that something *could* be incorrect about his belief that he owned the disputed property similar to his grandparents. However, Petitioner claimed the payments were intended as a temporary measure to maintain peace rather than an acknowledgment of ownership.[88]  He also denied that any payments he made ever constituted rent and noted that none of the payment memos on the checks referred to the payments as rent. [89]

However, in late 2023 and early 2024 when Respondent actively began to market the property, Petitioner took action to confirm whether his belief about the disputed property was correct by filing this lawsuit and the *lis pendens*.

The record contains no evidence that Petitioner's decision to file this lawsuit in 2024 and not 2014 was strategic or inequitable.  Nor is there credible evidence of

---

[86]  *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009).

[87]  *Id.*

[88]  *See* Tr. 9:5–19;  Tr. 61:16–21.

[89]  *See* Van Horn, Michael Dep. Tr. 29:4–32:11.

prejudice to Respondent. Rather, the record reflects that the Petitioner's concern about the disputed portion of land were not realized until 2024 when the Respondent attempted to sell the property. There is no evidence that the Respondent provided the Petitioner any documentation to contradict his belief that the disputed property was his or any attempt to oust the Petitioner or exclude Petitioner from the property before the property was listed for sale. As such, Respondent's laches argument fails as the record reflects the Petitioner filed this matter within months of the Respondent's attempt to sell the disputed property.

### D.    ATTORNEY'S FEES

Delaware follows the American rule which states that "[l]itigants are normally responsible for paying their own litigation costs."[90] An exception to this rule is the bad faith exception, which requires the party seeking to shift fees to satisfy "the stringent evidentiary burden of producing 'clear evidence' of bad faith."[91] None of the parties have engaged in conduct that would justify an award of bad faith fee shifting.

---

[90] *See Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[91] *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)).

The Respondent's characterization of Petitioner's claims as "baseless" amounts to advocacy; however, advocacy is a far cry from a judicial finding of frivolousness or bad faith. Petitioner seeks to confirm his ownership to the disputed land, a remedy grounded in Delaware's adverse possession law and supported by a developed record. Because the parties' positions rest on a reasonable factual and legal foundation, this case does not fall within any recognized exception to the American Rule. The Court therefore declines to shift attorneys' fees, and each party shall bear its own costs of litigation.

## III.  CONCLUSION

For the foregoing reasons, the Court finds that Michael Kelvin Van Horn established title to the property by adverse possession. The Court rejects Townsend Real Estate's defenses and counterclaims for lack of evidentiary support and finds no credible evidence of permissive use or lease.

Judgment shall be entered in Petitioner's favor unless exceptions are timely filed under Court of Chancery Rule 144. Upon this Report becoming final, Petitioner shall submit an implementing order.[92]

Respectfully submitted,

/s/ Loren Mitchell

Magistrate in Chancery

---

[92] The implementing order shall include a metes and bounds description of the disputed land based on a final survey at the Petitioner's expense.